25 P.3d 1022 (2001)
107 Wash.App. 42
GENERAL MOTORS CORPORATION, Appellant,
v.
CITY OF SEATTLE, Finance Department and City of Seattle, Office of the Examiner, Respondents.
Chrysler Corporation, Appellant,
v.
City Of Seattle, Finance Department and City of Seattle, Office of the Examiner, Respondents.
Nos. 46152-4-I, 47562-2-I, 47561-4-I.
Court of Appeals of Washington, Division 1.
May 7, 2001.
Publication Ordered June 11, 2001.
*1024 Steven L. Gross, City of Seattle Law Department, Cynthia Unwin Seu, Seattle, for Respondents.
Scott M Edwards, John Thomas Piper, Perkins Coie, Seattle, for Appellants.
*1023 BAKER, J.
General Motors Corporation (GM) and Chrysler Corporation challenge the City of Seattle's jurisdiction to impose on them a business and occupation tax measured by their gross receipts on wholesale auto sales to Seattle dealers. They claim that their contacts with the City are not sufficient to establish nexus under the federal Commerce Clause and alternatively, that the measure of tax is not fairly apportioned to the automakers' marketing activities within the City. Because their in-city advertising, sales/service calls, and marketing/service of warranties significantly impact the automakers' ability to maintain their market in Seattle, we hold that substantial nexus exists to impose the tax. Further, because well established Supreme Court precedent holds that business and occupation tax measured by gross receipts on wholesale sales is inherently apportioned, we affirm.

I
General Motors Corporation and Chrysler Corporation manufacture and sell automobiles and related parts and accessories to independent dealers located within the City of Seattle. Neither GM nor Chrysler maintains an office or bases any of their employees in the City. In fact, no direct solicitation of business occurs within the City. The automakers receive orders for autos and parts via computer, and the goods are shipped f.o.b.[1] factory via common carrier.
They do, however, conduct substantial marketing activities in Seattle. They send sales, service, and parts representatives on a monthly basis to visit their Seattle dealers. These representatives discuss market conditions with the dealers. They also impart information about new products and discuss retail customer satisfaction levels. The service representatives discuss problems that may be occurring with a certain make of automobile. They also make themselves available to speak with dissatisfied retail customers regarding product quality. GM employees make approximately 500 contacts per year to Seattle dealerships.
In addition, both GM and Chrysler direct national advertising to Seattle. Although the actual contract for advertising and ad preparation is performed outside the City, GM directs a portion of that advertising to the City in the sum of just under $6 million annually. Chrysler's advertising structure is similar.
The automakers' warranty program associated with the sales of new automobiles also serves a marketing function, because customers prefer to purchase automobiles with a warranty. The dealers market the availability of the warranties on behalf of the automakers *1025 and perform repair services for which they are paid by Chrysler and GM.
Chrysler requires its dealers to place large, permanent signs on dealership properties advertising Chrysler automobiles. Seattle dealers lease three of these signs from Chrysler. During the relevant audit period, GM also owned real property in Seattle, but it was not established that the property factored into the sales or marketing of GM products in any way.
During the years 1986-1995, Chrysler paid a business and occupation tax to the City of Seattle measured by the gross receipts of its wholesale sales in the City. In like manner, the City assessed tax against GM for the years 1986-1998. Both GM and Chrysler appealed the assessments to the City's Department of Finance. The hearing examiner affirmed and the automakers sought review by the Superior Court of King County, which also affirmed.[2] The automakers appeal.

II
Judicial review of a hearing examiner's decision is authorized by statutory writ of review under RCW 7.16.[3] On review, we must determine whether any rule of law affecting the parties' rights has been violated to their prejudice and whether the factual determinations were supported by substantial evidence.[4] Because neither party disputes the findings of fact entered in this matter, they are verities on appeal[5] and our sole task is to determine whether the hearing examiner erred in applying the law to the facts as it found them.
GM and Chrysler first challenge the City's jurisdiction to impose a business and occupation tax by arguing that they do not engage in business activities as defined by Seattle Municipal Code 5.44. SMC 5.44.400 levies and collects a business and occupation tax from every person for the privilege of engaging in business activities within the City. The code defines the term "business" broadly to include "all activities engaged in with the object of gain, benefit or advantage to the taxpayer ... directly or indirectly."[6] "Engaging in business" is further defined as "commencing, conducting or continuing in business and includes any business activity... whereby employees ... solicit sales, enter into contracts, deliver products or services, perform other business activities, endeavor to maintain a share of the market within the City, or the business entity avails itself of the benefits of an economic market in the City."[7]
The activities of GM and Chrysler within the City plainly fall within these broad definitions. Although they may not be characterized as direct selling activities, they nevertheless constitute "other business activities" that are designed to assist the automakers in "maintain[ing] a share of the market within the City." The automakers' reliance on the former Seattle Business Tax Rule (SBTR) 2 in effect during the relevant period does not assist them.[8] Although the rule listed examples of business activities that did not include the automakers' activities, it concluded with the proviso that the examples were illustrative only and that the list was not all-inclusive. We are satisfied that the automakers "avail [themselves] of an economic market" within the City.
The automakers next combine a statutory construction argument with a constitutional nexus challenge. They claim that their activities within the City do not satisfy "statutory nexus" under SMC 5.44.422, the language of which parallels the rule for determining nexus under Commerce Clause analysis. They *1026 then proceed to argue a constitutional nexus argument. The City argues that the section is merely a tool by which to measure tax due. Both parties are correct.
SMC 5.44.422 requires that taxpayers that have no place of business within the City, but nevertheless engage in wholesale sales within the City, allocate to Seattle for tax purposes:
[T]he gross proceeds of all sales in which the taxpayer's business activity within the City is either a determining element in the transaction or, under the facts and circumstances, a significant factor in making or holding the market here. Mere delivery of goods, without accompanying efforts to maintain an economic market, shall not constitute a determining element in affecting a transaction.[9]
Under Commerce Clause analysis, "the crucial factor governing nexus is whether the activities performed in [the] state on behalf of the taxpayer are significantly associated with the taxpayer's ability to establish and maintain a market in [the] state[10] for the sales."[11] Thus, while the code section certainly operates as an instrument of measure by which to determine tax due, as the automakers contend, the section effectively sets forth the constitutional test for Commerce Clause nexus as well. Because one analysis will resolve both the constitutional issue and the automakers' statutory obligations under SMC 5.44.422(A), we proceed to review the automakers' challenges under the federal Commerce Clause.

III
The United States Constitution grants to Congress the power to "regulate Commerce ... among the several States."[12] Within that express grant is a negative command, commonly known as the "dormant Commerce Clause," which prohibits a State from imposing any tax that discriminates against interstate commerce or out-of-state economic interests.[13] It is not the purpose of the Commerce Clause "to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business."[14] But it is essential that each State taxes "only its fair share of an interstate transaction."[15]
In Complete Auto Transit, Inc. v. Brady, the United States Supreme Court held that a state tax would withstand a challenge under the Commerce Clause if 1) it is applied to an activity with a substantial nexus with the taxing State; 2) it is fairly apportioned; 3) it does not discriminate against interstate commerce; and 4) it is fairly related to the services provided by the State.[16] The automakers in this case challenge the City's jurisdiction to tax under prongs 1 and 2 of the Complete Auto test.
The automakers first argue that their activities within the City are not sufficient to constitute substantial nexus under the Commerce Clause. In Tyler Pipe Industries, Inc. v. Washington State Department of Revenue, the Supreme Court approved the Washington Supreme Court's test for nexus in the context of business and occupation taxes as follows:
[The] crucial factor governing nexus is whether the activities performed in this state on behalf of the taxpayer are significantly associated with the taxpayer's ability *1027 to establish and maintain a market in this state for the sales.[17]
Tyler Pipe was an out-of-state manufacturer that made wholesale sales to companies within Washington State.[18] It maintained no office, owned no property, and based no employees in the State of Washington.[19] Solicitation of business was made by an independent contractor located in the State and by executives who resided out of State.[20]
The Court upheld nexus on these facts, noting that through its representative, Tyler Pipe maintained and improved its name recognition, market share, goodwill, and individual customer relations.[21] In addition, Tyler Pipe's representative provided the company with virtually all of its information regarding product performance, competing products, pricing, market conditions and trends, and other critical information concerning Tyler Pipe's Washington market.[22] The Court dismissed Tyler Pipe's distinction that its in-state representative was an independent contractor versus an employee as having no constitutional significance.[23]
In this case, both GM and Chrysler direct national advertising to the City of Seattle. They send sales, service, and parts managers to their dealers in Seattle on a monthly basis to discuss market conditions, new products, retail customer satisfaction levels, and the like. These representatives speak with dissatisfied customers and discuss problems that may be occurring with certain makes of automobiles. The representatives also train the dealers in sales and management techniques. Finally, the Seattle dealers actively market the automakers' warranties that accompany the sale of an automobile and make service repairs at the dealerships in Seattle on behalf of the automakers. These warranties serve an important marketing function because customers are unlikely to purchase a new vehicle without a warranty.
Although the automakers place great emphasis on the fact that they engage in no direct selling activities in Seattle, substantial nexus has never turned on this distinction. In Standard Pressed Steel Company v. Washington Department of Revenue,[24] the Supreme Court upheld nexus where the taxpayer conducted no selling activities within the State. It maintained its home office and manufacturing plant outside Washington, and its only contact with the State was one in-state employee who worked out of his home and several out-of-state engineers who visited The Boeing Company every six weeks.[25] The in-state employee was an engineer who consulted with Boeing regarding its needs and followed up on any difficulties Boeing had in the use of Standard's product after delivery.[26] He was also instrumental in obtaining and retaining goodwill and rapport with Boeing personnel.[27] All purchase orders were sent directly to Standard at its home office.
The Supreme Court characterized Standard's nexus challenge as "verg[ing] on the frivolous."[28] We note that although nexus was upheld on due process grounds and not on a Commerce Clause analysis, the Supreme Court has not overruled the case on this issue. We therefore continue to rely on its guidance.
The automakers' reliance on City of Tacoma v. Fiberchem, Inc.[29] is likewise misplaced. Fiberchem involved issues of intrastate commerce *1028 and relied on state constitutional due process law. The Commerce Clause of the federal constitution was not implicated. Moreover, the taxpayer in Fiberchem had no office in Tacoma, did not advertise in Tacoma, took no orders in Tacoma, and made no deliveries to Tacoma.[30] Its sole contact was one representative that made visits to Tacoma totaling 12 hours per month.[31] The contacts in this case far exceed the minimal contacts in Fiberchem.
We are satisfied that in this case, the collective activities of each automaker are strategically designed to maximize their sales within the City and that the absence of these activities would significantly affect their ability to maintain a share of the Seattle market. Without these activities, their name recognition, goodwill, ability to obtain market data, customer feedback, and trends unique to Seattle, and their ability to compete with other automakers would be adversely impacted. We hold that substantial nexus exists to justify the City's imposition of its business and occupation tax upon the automakers.
The automakers argue that Quill Corporation v. North Dakota,[32] which post-dates Tyler Pipe, sets a new and higher standard for nexus that they do not meet. We disagree. In Quill, the Court struck down North Dakota's attempt to collect a use tax from an out-of-state mail order company on products sold to in-state residents. Because Quill maintained no physical presence within the State,[33] the Court held that substantial nexus was not satisfied to justify the burden of collecting a use tax.[34]
In its opinion, the Court acknowledged that "contemporary Commerce Clause jurisprudence might not dictate the same result were the issue to arise for the first time today ..."[35] It nevertheless based its continued reliance on the physical presence test in the context of sales and use taxes because it provides a bright-line rule that encourages the "settled expectations" of the mail-order industry, whose "dramatic growth" over the previous quarter century has been likely because of this rule.[36] The Court was careful to note, however, that in its review of other types of taxes, it has not articulated the same physical presence requirement as stated for sales and use taxes.[37]
The automakers correctly argue that some state courts after Quill have extended the physical presence rule. In J.C. Penney National Bank v. Johnson,[38] the Tennessee Supreme Court extended the physical presence rule in the context of franchise taxes imposed on an out-of-state corporation.[39] A franchise tax is a tax for the privilege of carrying on a business in the corporate form.[40] A State cannot impose such a tax on a foreign corporation engaging in interstate commerce, but may impose the tax only on the privilege of engaging in intrastate commerce.[41] It thus follows that a physical presence would be required in order for a taxing jurisdiction to levy such a tax.
In contrast, the South Carolina Supreme Court in Geoffrey, Inc. v. South Carolina Tax Commission,[42] declined to extend the physical presence requirement in the context of income and business license taxes. Geoffrey, Inc. was a wholly-owned, second-tier subsidiary of Toys R Us, Inc., based in Delaware *1029 with no employees or offices in South Carolina.[43] However, it owned the trademark and trade name of "Toys R Us," which it licensed for use in the State.[44] As a result of that use, it received a 1% royalty on the net sales of Toys R Us stores in the state and the state sought to tax it. In rejecting Geoffrey's assertion that physical presence was required, the court reasoned:
Any corporation that regularly exploits the markets of a state should be subject to its jurisdiction to impose an income tax even though not physically present.[45]
The tax at issue here is neither a sales or use tax, nor is it a franchise tax. It is a business and occupation tax for the privilege of engaging in business within the City of Seattle.[46] The automakers certainly exploit the market in the City, regardless of where they are physically located. We decline to extend Quill's physical presence requirement in this context.
The automakers alternatively argue that Seattle's business and occupation tax is not fairly apportioned. The Complete Auto prong requiring fair apportionment ensures that "each State taxes only its fair share of an interstate transaction."[47] To prevent a State's overreaching, the Court has typically looked for the possibility of multiple taxation, "which is threatened whenever one State's act of overreaching combines with the possibility that another State will claim its fair share of the value taxed."[48] To this end, the Court applies a two prong test: first, a determination of whether the tax is "internally consistent" and if so, then whether it is also "externally consistent."[49] The automakers argue that Seattle's business and occupation tax is not internally consistent.
A tax is internally consistent when the identical tax could be imposed in every other taxing jurisdiction and the resulting burden to interstate commerce would be no greater than the burden intrastate commerce would also bear.[50] The test focuses on the integrity of the structure of the tax, rather than to what degree the tax reflects economic reality.[51] Thus, in this test, the taxpayer need not prove that it is actually being subjected to multiple taxation in two jurisdictions. If the tax at issue fails the test of internal consistency, a State, as a matter of law, is attempting to take more than its fair share of taxes from an interstate transaction.[52]
In Armco Inc. v. Hardesty,[53] the Supreme Court struck down West Virginia's gross receipts tax as internally inconsistent where the State exempted in-state manufacturers from its wholesaling tax, but out-of-state manufacturers were required to pay it. Likewise, in Tyler Pipe, the Supreme Court held that Washington's B & O tax was internally inconsistent because it exempted in-state manufacturers subject to the State's wholesale tax from the State's manufacturing tax on the same item, but it did not provide similar exemptions for out-of-state manufacturers. Thus, while in-state manufacturers were subject to only one tax, out-of-state manufacturers were subject to their own State's manufacturing tax and Washington's wholesaling tax.[54]
A careful review of Seattle's B & O tax demonstrates its soundness under the *1030 internal consistency test. SMC 5.44.400(C) provides:
Upon every person engaging within the City in the business of making sales at wholesale ... [shall be levied a tax for the privilege of engaging in business activities within the City] equal to the gross proceeds of such sales of the business without regard to the place of delivery of articles, commodities or merchandise sold ...
The code goes on to provide that if a person subject to tax has no place of business within the City, that person shall allocate to the City "the gross proceeds of all sales in which the taxpayer's business activity within the City is either a determining element in the transaction or, under the facts and circumstances, a significant factor in making or holding the market here."[55] The automakers argue that if this ordinance were in effect both in Seattle and in Michigan, where their headquarters are located, both jurisdictions could tax their wholesale sales to Seattle. They reason that if, arguendo, their activities in Seattle are a significant factor in maintaining a market here, Seattle has jurisdiction to tax the sale. But because the automakers allegedly negotiate the terms of the sale, investigate credit, accept orders, and receive the purchase price in Michigan, Michigan could conclude that those activities constitute a determining element of the sales transaction and thus, Michigan would also be able to tax the same wholesale sale.
Seattle Business Tax Rule 5-44-193A concerning "Outbound Interstate Selling Activity" lays those fears to rest. A reviewing court gives considerable deference to the construction of an ordinance by those officials charged with its enforcement.[56] SBTR 5-44-193A(3) states:
Outbound sales. The City of Seattle does not assess its retailing or wholesaling taxes on the sale of goods which originate in the City if receipt of the goods by the purchaser or its agent occurs outside Washington.
. . .
(b) If the seller delivers goods to the purchaser who receives them at a point outside Washington, an interstate deduction may be taken under the retailing or wholesaling classification as applicable. The interstate deduction applies even in cases where the shipment is arranged through a for-hire carrier or freight consolidator or freight forwarder acting on behalf of either the seller or purchaser. [Emphasis added].
The examples in the rule illustrate the above provisions. If an out-of-state purchaser receives the goods out of state, regardless of whether it paid for shipping or not, the transaction is an interstate sale qualifying for an interstate deduction.[57] Only if the out-of-state purchaser pays for shipping and authorizes the carrier or another agent to inspect and accept the goods in Washington is the sale taxable under the City's tax.[58] Thus, if Seattle's business tax were applied in Michigan, there is no possibility that the automakers would be subject to a wholesale tax there. We conclude that Seattle's business and occupation tax on wholesaling activities is internally consistent.
The automakers further argue that the tax is not externally consistent under the second prong under the fair apportionment analysis. External consistency looks:
[N]ot to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State.[59]
They contend that because they conduct marketing activities in both Seattle and in Michigan, Seattle may not fairly tax 100 percent of the gross receipts on products sold to Seattle, but only that percentage of gross receipts that equals the percentage of *1031 marketing activities they conducted in Seattle relative to the sale.
This argument relies in large part on a law review article[60] published after the Supreme Court decided Oklahoma Tax Commission v. Jefferson Lines, Inc.[61] In Jefferson Lines, the State of Oklahoma imposed a sales tax on the purchase of bus tickets for interstate travel. Jefferson Lines challenged the tax, claiming that Oklahoma could not tax the whole price of the ticket when portions of its value were attributed to services rendered in other States. The Court rejected this argument and upheld the tax. It reasoned that because the tax burden rested on the buyer, there was no reasonable possibility of multiple taxation in other jurisdictions.[62]
In so holding, the Court distinguished a prior case, Central Greyhound Lines, Inc. v. Mealey,[63] in which the facts were identical except that the tax assessed was a gross receipts tax imposed on Central Greyhound, not a retail sales tax imposed on the buyer. In that case, the Court held that a gross receipts tax had to be apportioned based on the mileage occurring in each State.[64] The Court noted that "Central Greyhound did not rest simply on the mathematical and administrative feasibility of a mileage apportionment, but on the Court's express understanding that the seller-taxpayer was exposed to taxation by New Jersey and Pennsylvania on portions of the same receipts that New York was taxing in their entirety."[65] The difference was, then, that in the context of sales and use tax, there was no danger of multiple taxation, but because there was an evident danger in the gross receipts tax involved in Central Greyhound, apportionment was required.
The automakers have seized on this holding as now requiring the nature of the apportionment they advance. But well established precedent holds directly to the contrary. In Tyler Pipe,[66] the Supreme Court rejected Tyler Pipe's apportionment challenge by concluding that, "the activity of wholesaling whether by an in-state or an out-of-state manufacturermust be viewed as a separate activity conducted wholly within Washington that no other State has jurisdiction to tax."[67] A tax on the gross receipts of wholesaling activities is inherently apportioned.[68] This holding was recently upheld in W.R. Grace & Co.Conn. v. State Department of Revenue[69] wherein the Washington Supreme Court characterized a similar argument as meritless.
Moreover, nothing in either Central Greyhound or Jefferson Lines stands for the particular argument the automakers advance. Central Greyhound and Jefferson Lines involved taxes on the sale of services as distinguished from a sale of goods. Unlike the sale of a good, the income from the sale of the service in Central Greyhound was necessarily earned after the sale by labor occurring in more than one State (i.e., mileage occurring in New York, Pennsylvania, and New Jersey). Thus, the Court held that the income from the sale of the service had to be apportioned among the States in which the labor was expended to perform the service.
In contrast, all the labor attributable to the creation of a good, namely manufacturing, occurs prior to the wholesale sale. The Court has held that manufacturing is a separate *1032 and distinct activity from wholesaling, and may be taxed separately.[70] It is this premise, not the automakers' argument, the authors in the law review article question in light of Jefferson Lines. Neither Central Greyhound nor Jefferson Lines held or implied that an apportionment of gross receipts based on marketing activities was required.
It is telling that the automakers have not alleged that they are effectively exposed to multiple taxation in this area. The Court in Central Greyhound was responding to that very possibility. The external consistency test looks at the real possibility of multiple taxation and the automakers in this case have not demonstrated it. We hold that Seattle's business and occupation tax is fairly apportioned.
AFFIRMED.
WEBSTER and AGID, JJ., concur.
NOTES
[1] "Free on board some location (for example, FOB shipping point; FOB destination). A delivery term which requires a seller to ship goods and bear the expense and risk of loss to the F.O.B. point designated.... Title to goods usually passes from seller to buyer at the FOB location." Black's Law Dictionary 642 (6th Ed.1990).
[2] The superior court remanded both matters back to the Department of Finance for determination of whether the activities in Seattle were dissociated with the interstate activity pursuant to SMC 5.44.422; however, the parties abandoned this claim and consolidated their actions in this appeal.
[3] SMC 5.44.120(D).
[4] RCW 7.16.120.
[5] Stuewe v. Dep't of Revenue, 98 Wash.App. 947, 950, 991 P.2d 634 (2000).
[6] SMC 5.44.022(1).
[7] SMC 5.44.022(8).
[8] Rule 2 was amended and redesignated SBTR 5-44-102 in 1997, expanding the non-exclusive list of what constitutes "engaging in business."
[9] SMC 5.44.422(A).
[10] Although the City of Seattle is a municipality and not a state, most discussions of the Commerce Clause materials refer to a "State's" power to tax. Consequently, our use of the term "State" herein shall apply equally to the City.
[11] Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue, 483 U.S. 232, 250, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987).
[12] Oklahoma Tax Comm'n v. Jefferson Lines, Inc., 514 U.S. 175, 179, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995) (citing U.S. Const., Art. I, § 8, cl.3).
[13] Jefferson Lines, 514 U.S. at 179, 115 S.Ct. 1331.
[14] Jefferson Lines, 514 U.S. at 182, 115 S.Ct. 1331 (citing Western Live Stock v. Bureau of Revenue, 303 U.S. 250, 254, 58 S.Ct. 546, 82 L.Ed. 823 (1938)).
[15] Jefferson Lines, 514 U.S. at 184, 115 S.Ct. 1331.
[16] 430 U.S. 274, 279, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977).
[17] Tyler Pipe, 483 U.S. at 250, 107 S.Ct. 2810.
[18] Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810.
[19] Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810.
[20] Tyler Pipe, 483 U.S. at 249, 107 S.Ct. 2810.
[21] Tyler Pipe, 483 U.S. at 249-50, 107 S.Ct. 2810.
[22] Tyler Pipe, 483 U.S. at 250, 107 S.Ct. 2810.
[23] Tyler Pipe, 483 U.S. at 249-50, 107 S.Ct. 2810.
[24] 419 U.S. 560, 95 S.Ct. 706, 42 L.Ed.2d 719 (1975).
[25] Standard Pressed Steel, 419 U.S. at 561, 95 S.Ct. 706.
[26] Standard Pressed Steel, 419 U.S. at 561, 95 S.Ct. 706.
[27] Standard Pressed Steel, 419 U.S. at 561, 95 S.Ct. 706.
[28] Standard Pressed Steel, 419 U.S. at 562, 95 S.Ct. 706.
[29] 44 Wash.App. 538, 722 P.2d 1357 (1986).
[30] Fiberchem, 44 Wash.App. at 540, 722 P.2d 1357.
[31] Fiberchem, 44 Wash.App. at 540, 722 P.2d 1357.
[32] 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992).
[33] Quill, 504 U.S. at 315, 112 S.Ct. 1904.
[34] Quill, 504 U.S. at 311, 112 S.Ct. 1904.
[35] Quill, 504 U.S. at 311, 112 S.Ct. 1904.
[36] Quill, 504 U.S. at 316, 112 S.Ct. 1904.
[37] Quill, 504 U.S. at 314, 112 S.Ct. 1904.
[38] 19 S.W.3d 831, cert. denied, ___ U.S. ___, 121 S.Ct. 305, 148 L.Ed.2d 245 (2000).
[39] J.C. Penney, 19 S.W.3d at 839.
[40] Ronald D. Rotunda & John E. Nowak, Treatise on Constitutional Law, Substance and Procedure, § 13.5 at 391 (3d ed.1999).
[41] Rotunda & Nowak, supra, § 13.5 at 392-93.
[42] 313 S.C. 15, 437 S.E.2d 13, cert. denied, 510 U.S. 992, 114 S.Ct. 550, 126 L.Ed.2d 451 (1993).
[43] Geoffrey, 313 S.C. at 16, 437 S.E.2d 13.
[44] Geoffrey, 313 S.C. at 16, 437 S.E.2d 13.
[45] Geoffrey, 313 S.C. at 23, 437 S.E.2d 13, (citing J. Hellerstein & W. Hellerstein, State Taxation, Para. 6.08 (2d ed.1992)).
[46] SMC 5.44.400.
[47] Jefferson Lines, 514 U.S. at 184, 115 S.Ct. 1331.
[48] Jefferson Lines, 514 U.S. at 184, 115 S.Ct. 1331.
[49] Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
[50] Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
[51] Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
[52] Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
[53] 467 U.S. 638, 104 S.Ct. 2620, 81 L.Ed.2d 540 (1984).
[54] Tyler Pipe, 483 U.S. at 243, 107 S.Ct. 2810.
[55] SMC 5.44.422(A).
[56] Citizens for a Safe Neighborhood v. City of Seattle, 67 Wash.App. 436, 440, 836 P.2d 235 (1992).
[57] SBTR 5-44-193A(6)(b).
[58] SBTR 5-44-193A(6)(d).
[59] Jefferson Lines, 514 U.S. at 185, 115 S.Ct. 1331.
[60] Walter Hellerstein et al., Commerce Clause Restraints on State Taxation After Jefferson Lines, 51 Tax L.Rev. 47 (1995).
[61] 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995).
[62] Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331.
[63] 334 U.S. 653, 68 S.Ct. 1260, 92 L.Ed. 1633 (1948).
[64] Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331.
[65] Jefferson Lines, 514 U.S. at 190, 115 S.Ct. 1331.
[66] Counsel in this case, John T. Piper, served as counsel in Tyler Pipe, and is thus quite conversant with the issue and the Supreme Court's position on it.
[67] Tyler Pipe, 483 U.S. at 251, 107 S.Ct. 2810.
[68] Rotunda & Nowak, supra, § 13.6 at 411.
[69] 137 Wash.2d 580, 595, 973 P.2d 1011 (1999), cert. denied, 528 U.S. 950, 120 S.Ct. 371, 145 L.Ed.2d 290 (1999).
[70] Tyler Pipe, 483 U.S. at 251, 107 S.Ct. 2810.