149 P.3d 380 (2006)
COMMUNITY TELECABLE OF SEATTLE, INC.; Comcast of Washington I, Inc.; and Comcast of Washington IV, Inc., Respondents,
v.
CITY OF SEATTLE, DEPARTMENT OF Executive ADMINISTRATION, Appellant.
No. 57491-4-I.
Court of Appeals of Washington, Division 1.
December 11, 2006.
*381 Kent Charles Meyer, City of Seattle Attorneys Office, Seattle, WA, for Appellant.
Randal Lee Gainer, Dirk Jay Giseburt, Davis Wright Tremaine, Seattle, WA, for Respondents.
COLEMAN, J.
¶ 1 This case concerns the legality of the City of Seattle's telephone utility tax as it applies to Comcast's Internet transmission activities. Comcast sued the City for a refund of the tax, arguing that the tax is illegal under Washington's Internet Tax Moratorium and the federal Internet Tax Freedom Act. The trial court granted Comcast's cross-motion for summary judgment and denied the City's motion for summary judgment. The City appeals. We reverse because:
¶ 2 1. The tax is not barred by the Washington Internet Tax Moratorium;
¶ 3 2. The tax is exempt from the federal Internet Tax Freedom Act's moratorium on taxes on Internet access under a grandfather clause; and
¶ 4 3. The tax is not discriminatory under the federal Internet Tax Freedom Act.

FACTS
Comcast's Business in Seattle
¶ 5 Comcast owns a cable transmission network leading to many homes and businesses in Seattle. Comcast and its predecessor corporations entered into franchise agreements with the City for the right to run cable to customers in Seattle. As a result, Comcast owns a transmission system in Seattle that includes cable running to individual properties and a network of fiber optics, cables, and other equipment to transmit between its Seattle customers and Comcast's "head end" in Burien, Washington.
¶ 6 In addition to providing cable television signals over its Seattle cable network, Comcast also offers its customers the ability to use the cable network for a high-speed broadband Internet connection. The use of *382 the cable network for this purpose began in approximately early 1998.
¶ 7 In September 1995, in anticipation of the use of the cable network as a connection to the Internet, Comcast's predecessor and the City entered into a memorandum of understanding as part of cable refranchise discussions. The memorandum stated, "[T]elecommunications and Internet service shall be taxed at the City rate for telecommunications services (currently 6%)."
¶ 8 Comcast provides its Internet customers with a device for their home called a cable modem that allows its customers to use the cable network for the Internet. The actual pathway to the customer's house for the Internet is through the same cable used for cable television service. The transmission of the Internet signal to and from the customer's house is through a coaxial cable that leads to a pole outside the house, then through fiber optic cable to hubs in Seattle, and from there through fiber optic cable to Comcast's head end in Burien. From Burien, the signal travels by fiber optic cable to a facility at the Westin Building in Seattle. The signal leaves the Westin Building by fiber optic cable.
¶ 9 Comcast's customers receive, through the network, Internet services such as email and the ability to use a browser to access web pages on the World Wide Web. Comcast has previously entered into contracts with other entities to provide Internet services to Comcast's customers. During much of the time period at issue in this case, Comcast's customers received Internet services from a company known as Excite@home. Excite@ home had contracts with Comcast that allowed Excite@home to provide Internet service and all equipment necessary to provide those services other than the equipment provided by Comcast between the subscriber's home and the head end in Burien. In exchange for providing this equipment and services to Comcast's subscribers, Excite@home agreed to split certain subscriber revenues with Comcast. Comcast received 65 percent of these revenues and Excite@home received 35 percent. In effect, Comcast provided the portion of the transmission system from the subscriber's home to the head end and Excite@home provided other infrastructure and the Internet services received by the subscribers. In November 2001, Excite@ home ceased providing Internet services to Comcast's customers. Comcast then used a variety of other entities to provide the services that Excite@home had provided.
The Tax
¶ 10 The City imposes a telephone utility tax on entities engaged in the business of transmitting data over a network in Seattle. SMC 5.48.050A. Under SMC 5.48.050A, Seattle businesses must pay a tax of six percent on the revenue from that business. The Seattle Municipal Code defines "telephone business":

"Telephone business" means the providing by any person of access to a local telephone network, local telephone network switching service, toll service, cellular or mobile telephone service, coin telephone services, pager service or the providing of telephonic, video, data, or similar communication or transmission for hire, via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. The term includes cooperative or farmer line telephone companies or associations operating exchanges. The term also includes the provision of transmission to and from the site of an Internet provider via a local telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. `Telephone business' does not include the providing of competitive telephone service, or providing of cable television service, or other providing of broadcast services by radio or television stations.
SMC 5.30.060C (emphasis added).
¶ 11 In addition to enacting SMC 5.48.050A, the City amended Seattle Business Tax Rule 5-44-155(6) in 1995 to advise Internet companies that provided data transmission services that data transmission activities were subject to the telephone utility tax and that Internet services were subject to the business and occupation (B & O) service tax. The rule was repealed in 2001. The City continued to rely on the rule for guidance *383 and placed a statement to that effect on its website. Since prior to 1998, the City has enforced the tax code so that a company that owns transmission capability through wire, cable, microwave, or other medium is considered a telephone business under SMC 5.30.060C and is subject to the telephone utility tax under SMC 5.48.050. The City collected the utility tax from other companies using networks to transmit Internet services and also collected the service B & O tax from Internet service providers.
The Audit
¶ 12 Prior to March 15, 2002, Comcast paid the cable television tax to the City for its cable modem services revenue rather than the telephone utility tax. The City taxes cable television activities at ten percent. In a letter dated September 20, 2000, the City instructed Comcast to report its cable modem service revenue under the telephone business classification of the utility tax rather than under the cable television tax. The City then sent a letter on October 6, 2000, rescinding these instructions and advising Comcast that, "[a] task force made up of personnel from our tax, cable and legal departments is meeting to discuss your business practices, and to formulate correct legal and contractual positions." In a December 26, 2000 letter, the City instructed Comcast to pay the six percent telephone utility tax on its cable modem activity revenue. Comcast, however, continued to pay the higher cable television tax until March 15, 2002. On April 29, 2002, Comcast informed the City that in the future, it would pay neither the telephone utility tax nor the cable television tax. Instead, it would only pay the .415 percent B & O tax rate imposed on service activities under SMC 5.45.050. The City disagreed with Comcast's conclusion and repeated in a May 9, 2002 letter its instruction that Comcast should report cable modem revenue under the telephone utility tax. Comcast refused to comply with these reporting instructions.
¶ 13 On June 18, 2002, the City notified Comcast that it would conduct an audit of Comcast's business activities. The City conducted the audit and concluded that Comcast was subject to the telephone utility tax for its revenue from data transmission activities in connection with Internet service. Accordingly, the City issued tax assessments to Comcast on July 25, 2003. The City assessed its utility tax against Comcast for engaging in the telephone business in Seattle in 2001 and 2002 (the "audit period"). The assessments included a credit to reimburse Comcast for the period during which it had incorrectly paid the ten percent cable television tax.
¶ 14 Comcast sued the City for a refund of the tax and declaratory relief, arguing that the tax is illegal under Washington's Internet Tax Moratorium and the federal Internet Tax Freedom Act. The trial court denied the City's motion for summary judgment and granted Comcast's cross-motion for summary judgment. The City appeals. We reverse for the reasons stated below.

ANALYSIS
Failure to Make Records Available During Audit
¶ 15 The City argues that Comcast is barred under SMC 5.55.060D from challenging the tax because it allegedly failed to make records available during the audit. SMC 5.55.060D provides:
Any person who fails, or refuses a Department request to provide or make available records . . . shall be forever barred from questioning in any court action, the correctness of any assessment of taxes made by the City based upon any period for which such records have not been provided, made available or kept and preserved. . . .
Comcast argues that (1) it did comply with the City's requests for information during the audit, (2) SMC 5.55.060D is an unconstitutional limit on the jurisdiction of superior courts under Article IV, section 6 of the Washington State Constitution, and (3) SMC 5.55.060D creates a conclusive presumption in violation of the Washington State Constitution. We do not decide these issues because we conclude that the tax itself is legal under the Washington Internet Tax Moratorium *384 and the federal Internet Tax Freedom Act.[1]
Washington's Internet Tax Moratorium
¶ 16 Comcast contends that Washington's Internet Tax Moratorium prohibits the City from taxing it at more than 0.415 percent, the City's general B & O service rate. The City argues that the moratorium does not affect taxes on revenue from data transmission via a cable transmission system. We conclude that the moratorium does not preclude the City from taxing revenue from data transmission activity via a cable transmission system because of the plain language of the statutes and a persuasive interpretation of the statutes by the Washington Department of Revenue.
¶ 17 RCW 35.21.717 states:
Until July 1, 2006, a city or town may not impose any new taxes or fees specific to Internet service providers. A city or town may tax Internet service providers under generally applicable business taxes or fees, at a rate not to exceed the rate applied to a general service classification. For the purposes of this section, "Internet service" has the same meaning as in RCW 82.04.297.
RCW 82.04.297(3) defines "Internet service" as
a service that includes computer processing applications, provides the user with additional or restructured information, or permits the user to interact with stored information through the internet or a proprietary subscriber network. "Internet service" includes provision of internet electronic mail, access to the internet for information retrieval, and hosting of information for retrieval over the internet or the graphical subnetwork called the world wide web.
This definition of Internet services does not include the telephone business activities that are taxed under the City's telephone utility tax.
¶ 18 State statutes specifically distinguish between Internet service and network telephone service, preserving the City's ability to tax Comcast's data transmission activities as telephone business. In the same legislative bill that created the Internet Tax Moratorium, the legislature amended the definition of "network telephone service" to distinguish it from Internet service. Laws of 1997, ch. 304, §§ 2, 5. RCW 82.04.065(2) defines network telephone service to include data transmission, including transmission to and from the site of an Internet provider:

"Network telephone service" means the providing by any person of access to a telephone network, telephone network switching service, toll service, or coin telephone services, or the providing of telephonic, video, data, or similar communication or transmission for hire, via a telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. "Network telephone service" includes the provision of transmission to and from the site of an internet provider via a telephone network, toll line or channel, cable, microwave, or similar communication or transmission system. "Network telephone service" does not include the providing of competitive telephone service, the providing of cable television service, the providing of broadcast services by radio or television stations, nor the provision of internet service as defined in RCW 82.04.297, including the reception of dial-in connection, provided at the site of the internet service provider.
(Emphasis added.) The statute specifically distinguishes between network telephone service (which includes data transmission via a cable system) and internet service (which, under the moratorium, cannot be taxed at a rate higher than the rate applied to a general service classification). RCW 82.04.065(2) allows the City to tax data transmission activities because such activities are distinct from "internet service"  the subject of the moratorium.
*385 ¶ 19 Comcast's data transmission activities are covered by the descriptions of network telephone service in RCW 82.04.065 and, thus, not protected by the moratorium. First, Comcast provides data transmission over a cable system in accordance with the first sentence in RCW 82.04.065(2) ("`Network telephone service' means the providing by any person of . . . data . . . transmission . . . via a . . . cable . . . transmission system."). Second, Comcast provides "transmission to and from the site of an internet provider" via a cable transmission system as described in the second sentence of RCW 82.04.065(2). The undisputed facts show that Comcast provides a cable transmission system from its customers' homes and businesses to Comcast's facilities in Burien and then to the Westin Building.
¶ 20 Comcast argues that the definition of network telephone service does not apply to its activities because it provides Internet services in addition to a transmission system. Comcast is incorrect. Under the plain language of RCW 82.04.065(2), "network telephone service" includes any entity that provides "transmission to and from the site of an internet provider via a . . . cable . . . transmission system." Comcast also provides "Internet services" (as defined in RCW 82.04.297), which, under the moratorium, cannot be taxed at a rate higher than the rate applied to a general service classification. This does not mean, however, that the City is precluded from imposing its six percent telephone utility tax on Comcast's revenue from data transmission. As the City points out, "[u]nder Comcast's interpretation of RCW 35.21.717, any telephone business could avoid the telephone utility tax simply by offering its customers Internet services such as email and access to the web." Brief of Appellant, at 20. Comcast cannot avoid the City's telephone utility tax on data transmission activities by bundling its charges for cable data transmission with its charges for Internet services. State law distinguishes between network telephone services, such as data transmission via a cable network, and Internet services, allowing the City to tax Comcast's data transmission activities as a "telephone business."
¶ 21 This interpretation of Washington law is supported by an Excise Tax Advisory (ETA) issued by the Washington Department of Revenue. ETA 2029.04.245 confirms that the 1997 amendment to the definition of "network telephone service" explicitly includes data transmission via cables to and from the site of an Internet provider. ETA 2029.04.245 states:
This includes services used to connect an ISP to the Internet backbone or to ISP customer locations, such as the provision of transmission capacity over dial-up connections, coaxial cables, fiber optic cables, T-1 lines, frame relay service, digital subscriber lines (DSL), wireless technologies, or other means.
Washington has traditionally taxed the sale of these network telephone services to a customer under the retailing classification of the business and occupation tax (B & O) tax and required the seller to collect retail sales tax. In 1997, RCW 82.04.065 was amended to explicitly include "the provision of transmission to and from the site of an internet provider via a local telephone network, toll line, or channel, cable, microwave, or similar communication or transmission system" as taxable network telephone service.
The Department of Revenue concurs with the City that network telephone services include data transmission over cable networks to internet customer locations. A reviewing court gives considerable deference to the construction of an ordinance by those officials charged with its enforcement. GMC v. City of Seattle, 107 Wash.App. 42, 57, 25 P.3d 1022 (2001). Network telephone services, which are taxed by the City as "telephone business," are not subject to Washington's Internet Tax Moratorium.
¶ 22 Comcast argues that under Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs., 545 U.S. 967, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005), the data transmission component of its Internet provision cannot be separated from the Internet services it offers. Comcast's reliance on Brand X is misplaced because Brand X is not binding on a Washington court interpreting Washington law. In Brand X, the Court considered *386 whether the Federal Communications Commission's classification of broadband cable modem service under the federal Telecommunications Act of 1996 as an "information service" rather than a "telecommunications service" was reasonable under Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) and the federal Administrative Procedures Act. Brand X, 545 U.S. at 967, 125 S.Ct. 2688. It did not consider whether data transmission was inseparable from Internet service under Washington law. It also did not address whether, under federal law, states and local governments can tax revenue from cable modem service as a network telephone service.
Tax on Interstate Services
¶ 23 Comcast argues that the City's tax on telephone business is illegal because RCW 35.21.714 prohibits cities from imposing their telephone utility taxes on interstate service. Comcast reasons that this statute bars the City from taxing its data transmission activities because all of the Internet traffic from Comcast's Seattle subscribers is delivered to an out-of-state location.
¶ 24 Comcast misrepresents RCW 35.21.714. This statute merely precludes the City from taxing the portion of network telephone service that represents charges to another telecommunications company for access to interstate services. RCW 35.21.714 provides in relevant part:
Any City which imposes a . . . tax . . . upon the business activity of engaging in the telephone business . . . may impose the . . . tax . . . on one hundred percent of the total gross revenue derived from intrastate toll telephone services . . .: PROVIDED, that the City shall not impose the . . . tax on that portion of network telephone service . . ., which represents charges to another telecommunications company . . . for access to, or charges for, interstate services. . . .
Comcast has not shown, or even alleged, that it charges another telecommunications company for interstate services.
¶ 25 RCW 35.21.714 requires cities to give a deduction for the portion of network telephone service that represents a charge to another telecommunications company for interstate services. It does not bar the City from taxing Comcast's data transmission revenue simply because data transmission signals cross Washington's borders. Comcast's interpretation of RCW 35.21.714 would make it impossible for cities to tax telephone business because many data transmissions and traditional telephone line transmissions are delivered to an out-of-state location. RCW 35.21.714 concerns charges to other telecommunications companies for interstate services. Such charges are not at issue in this case.[2]
The Federal Internet Tax Freedom Act's Moratorium on Taxes on Internet Access
¶ 26 Comcast argues that the City is subject to the federal Internet Tax Freedom Act (ITFA) because its telephone utility tax is a tax on "Internet access" as that term is defined in the ITFA. The City contends that its telephone business tax does not tax "Internet access." We do not decide this issue because we hold that even if the City taxes "Internet access" as that term is used in the ITFA, (1) the City's tax is exempt under the ITFA's grandfather clause and (2) the tax is not a discriminatory tax on electronic commerce.[3]
*387 ITFA's Grandfather Clause
¶ 27 Comcast argues that the City is precluded from taxing it as a telephone business under the ITFA's moratorium on taxes on "Internet access." The City contends that it is exempt from this moratorium under the ITFA's grandfather clause. We conclude that the City's tax is exempt under the grandfather clause because it was authorized by the State before October 1, 1998, the City notified taxpayers of the tax before October 1, 1998, and the City generally collected the tax prior to October 1, 1998.
¶ 28 As originally enacted and through its first extension, the ITFA provides:

No State or political subdivision thereof may impose any of the following taxes during the period beginning on October 1, 1998, and ending on November 1, 2003 
(1) taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and
(2) multiple or discriminatory taxes on electronic commerce.
ITFA, § 1101(a) (2003) (emphasis added). The ITFA defines the terms "generally imposed and actually enforced" to mean that the law was authorized by statute and that either notice was given or the tax was generally collected:
For purposes of this section, a tax has been generally imposed and actually enforced prior to October 1, 1998, if, before the that date, the tax was authorized by statute and either 
(1) a provider of Internet access services had a reasonable opportunity to know by virtue of a rule or other public proclamation made by the appropriate administrative agency of the State or political subdivision thereof, that such agency has interpreted and applied such tax to Internet access services; or
(2) a State or political subdivision thereof generally collected such tax on charges for Internet access.
ITFA, § 1101(d) (2001). To be exempt under the grandfather clause, the City's tax first must have been authorized by statute before October 1, 1998. Second, either Comcast must have had a reasonable opportunity to know by rule or other public proclamation that the City taxed its data transmission activities before October 1, 1998, or the City must have generally collected the tax before October 1, 1998. Each of these issues will be considered.
¶ 29 The City's tax has been authorized by statute since at least 1997. Cities in Washington are authorized by statute to impose taxes such as Seattle's telephone utility tax and B & O service tax. See RCW 35.22.280(32); RCW 35.22.570; RCW 35.21.714; RCW 35.21.870(1). And as explained above, Washington's Internet Tax Moratorium does not preclude the City from imposing its telephone business tax on Comcast's data transmission activities. In 1997, the same year the state legislature enacted the Internet tax moratorium, it also amended the definition of "network telephone service" to preserve state and local government's ability to tax data transmission activities such as Comcast's.
¶ 30 The next requirement is that Comcast had "a reasonable opportunity to know" by rule or other proclamation that the City "has interpreted and applied such tax to Internet access services" before October 1, 1998. ITFA, § 1101(d) (2001). Comcast had a reasonable opportunity to know by virtue of a rule that the City applied its telephone utility tax to companies transmitting Internet services. In 1995, the City amended Seattle Business Tax Rule 5-44-155(6) (Rule 155) to advise Internet companies that provided data transmission services that data transmission activities were subject to the telephone utility tax and that Internet services were subject to the B & O service tax. The Seattle Business Tax Rules are passed according to the procedures in SMC chapter 3.02. Prior to adoption, amendment, or repeal of a rule, the City is required to publish in a newspaper and hold a public hearing, as well as provide a draft to anyone who requests one. The final rules are available from the City Clerk, *388 the RCA division, and, since the mid-1990s, the City's web site. Rule 155 was amended in 1995 in accordance with this procedure.
¶ 31 By enacting Rule 155, the City notified the public that it imposed its telephone utility tax on companies that transmitted data related to the Internet. Rule 155 provided:
Providers of information services on the Internet, or on other electronic networks, are subject to the service classification on their gross "Service" charges. An internet provider located in Seattle must insure payment of the Seattle public utility tax on their telephone access charges for the telephone lines, microwave, or other method of electronic transmission. Non-payment of the public utility tax on the aforementioned telephone access charges will indicate to the City that the internet provider is holding itself out to be in the telephone business (see SMC 5.48.020). In such a case, the gross charges by the internet provider to their clients will be apportioned between the public utility tax and the service business and occupation tax classification based on the ratio of telephone line costs (or similar costs) to the total costs of doing business.

(Emphasis added.) The City notified the public in Rule 155 that it would apportion an Internet provider's revenue based on its transmission costs and other costs of doing business. Through Rule 155, the City met the notice requirement of IFTA, § 1101(d)(1) (2001).
¶ 32 Comcast argues that Rule 155 fails the ITFA's notice requirement because it was repealed effective December 31, 2001. Comcast cites three cases to support its argument: Cazzanigi v. Gen. Elec. Credit Corp., 132 Wash.2d 433, 441, 938 P.2d 819, 822 (1997); State v. Burke, 92 Wash.2d 474, 478, 598 P.2d 395 (1979); and Glubrecht v. Dep't of Revenue, No. 55759, 2002 WL 726433 (Wash. Bd. of Tax Appeals Feb. 28, 2002), available at http://www.bta.state.wa.us/ and. None of these decisions concerns the effect of a repealing a statute on notice requirements.
¶ 33 Though it was repealed, Rule 155 satisfied the ITFA's notice requirement. The rule remained in effect for six years, including the first year of the audit period. The City continued to rely on the rule for guidance and placed a statement to that effect on its website. Thus, Rule 155 provided notice prior to October 1, 1998, that the City applied its telephone utility tax to companies that transmitted data related to the Internet. Moreover, before Rule 155 was repealed, the Seattle Municipal Code already contained provisions taxing utilities engaged in the telephone business and defined "telephone business" to include data transmission via cable. See SMC 5.48.050A and SMC 5.30.060C. These statutes also provided notice that the City applied its telephone utility tax to companies that transmitted data related to the Internet.
¶ 34 Comcast argues that Rule 155 was invalid because it (1) created a conclusive presumption in violation of the Washington State Constitution, (2) was not authorized under the Seattle Municipal Code, and (3) was discriminatory. Rule 155 stated that the City would enforce its tax code so that companies engaged in both providing telephone business and Internet services would be required to pay the telephone utility tax and the Internet service tax. It stated that the City would apportion revenues between the two activities. Comcast's arguments about the validity of Rule 155 do not eliminate the fact that as early as 1995, the rule notified businesses that the City applied its telephone utility tax to companies transmitting data related to the Internet.[4]
¶ 35 Even if the City did not provide sufficient notice to Comcast, the tax can still qualify for the grandfather clause if the City "generally collected" it prior to October 1, 1998. ITFA § 1101(a)(2). The City contends *389 that it has generally collected the tax since at least 1994. Comcast argues that the City has not generally collected the tax because in an October 6, 2000 letter, it instructed Comcast's predecessor to continue reporting its Internet revenues under the ten percent cable television classification of the utility tax until further notice. In that letter, the City stated: "A task force made up of personnel from our tax, cable and legal departments is meeting to discuss your business practices, and to formulate correct legal and contractual provisions." This letter notwithstanding, the City generally imposed and actually enforced its telephone utility tax on Internet related data transmissions prior to October 1, 1998.
¶ 36 The City notified Comcast's predecessor directly in the 1995 memorandum that cable modem activities would be subject to the six percent telephone utility tax. It notified Summit, the only other cable company operating in Seattle, in 1996 that its cable modem activities were subject to the utility tax. Since prior to 1998, the City has enforced the tax code so that a company that owns transmission capability through wire, cable, microwave, or other medium are considered a telephone business under SMC 5.30.060C and, thus, subject to the telephone utility tax under SMC 5.48.050A. Comcast does not deny that the City collected the utility tax from other companies, such as Summit, that used networks to transmit Internet services and also collected the service B & O tax from mere Internet service providers, such as Speakeasy. The October 6, 2000 letter merely shows that there was confusion over what tax Comcast was supposed to pay. It does not show that the City failed to generally collect the six percent tax from companies using networks to transmit Internet services. The ITFA does not require a taxing jurisdiction to collect and enforce its taxes with 100 percent accuracy. This would be impossible in a self-reporting tax system like the City's.
Discriminatory Taxes
¶ 37 Comcast argues that the tax violates the ITFA's moratorium on discriminatory taxes on electronic commerce. We conclude that the tax is not discriminatory because all companies in Seattle that engage in the telephone business are subject to the telephone utility tax and all companies that provide Internet services are subject to the B & O tax.
¶ 38 Unlike the ITFA's moratorium on taxes on Internet access, the ban on discriminatory taxes does not have a grandfather clause. The ITFA provides:

No state or political subdivision thereof may impose any of the following taxes during the period beginning on October 1, 1998, and ending November 1, 2003 
(1) taxes on Internet access, unless such tax was generally imposed and actually enforced prior to October 1, 1998; and
(2) multiple or discriminatory taxes on electronic commerce.

ITFA, § 1101(a) (2001) (emphasis added). "The term `electronic commerce' means any transaction conducted over the Internet or through Internet access, comprising the sale, lease, offer, or delivery of property, goods, services, or information, whether or not for consideration, and includes the provision of Internet access." ITFA, § 1104(3) (2001).[5] ITFA, § 1104(2) (2001) defines "discriminatory tax" to mean:
(A) any tax imposed by a State or political subdivision thereof on electronic commerce that 
(i) is not generally imposed and legally collectible by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means;
(ii) is not generally imposed and legally collectible at the same rate by such State or such political subdivision on transactions involving similar property, goods, services, or information accomplished through other means, unless the rate is lower as part of a phase-out of the tax over not more than a 5-year period;
(iii) imposes an obligation to collect or pay the tax on a different person or entity *390 than in the case of transactions involving similar property, goods, services, or information accomplished through other means; [or]
(iv) establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers that the tax rate generally applied to providers of similar information services delivered through other means[.]
Comcast argues the tax is discriminatory under ITFA, § 1104(2)(A)(i), (ii), (iii), and (iv). The first three provisions, ITFA, § 1104(2)(A)(i), (ii), (iii), do not apply to this case. They are intended to apply to an attempt to tax transactions differently over the Internet than off the Internet. Even if these provisions applied, the City's taxes would not be affected. The City's telephone utility tax applies uniformly to companies engaged in the telephone business. The City's service B & O tax applies uniformly to companies providing services, such as Internet services.
¶ 39 The City's tax is not discriminatory under ITFA, § 1104(2)(A)(iv). Under this section, a tax is discriminatory if it:
establishes a classification of Internet access service providers or online service providers for purposes of establishing a higher tax rate to be imposed on such providers than the tax rate generally applied to providers of similar information services delivered through other means[.]
ITFA, § 1104(2)(A)(iv). Seattle taxes Comcast's data transmission activities at the same rate as similar information services delivered through other means. The City's telephone utility tax applies uniformly to all companies engaged in telephone business in Seattle, including data transmission through telephone networks or through cable networks. The tax is based on the gross income from that business activity. Similarly, the City's B & O tax applies to companies providing Internet services in Seattle. The tax is based on the gross income from providing Internet services. Neither of these taxes creates a separate class of Internet access service providers that are taxed at a separate rate despite providing similar information services. All companies in Seattle that engage in the telephone business are subject to the telephone utility tax and all companies that provide Internet services are subject to the B & O tax.
¶ 40 The Pennsylvania Supreme Court's decision in Concentric Network Corp. v. Commonwealth of Pennsylvania, 897 A.2d 6, 15 (Penn.2006) supports this conclusion. In that case, an Internet service provider, Concentric, did not own wires for transmitting "`its Customers' data traffic to and from the [Taxpayer's] serving office and to and from the Internet backbone.'" Concentric, 897 A.2d at 8. Instead of owning wires, Concentric purchased data transport services and equipment to transmit Internet services. It paid a state sales and use tax on the purchases. It appealed the state's imposition of the sales and use tax, arguing that the tax was discriminatory under the ITFA because cable-based and facilities-based Internet service providers did not have to pay the tax (because they already owned and, thus, did not need to purchase infrastructure for transmitting data). The court ruled that Concentric was not subject to discrimination under the ITFA merely because it paid a sales and use tax on the purchase of data transmission services which other companies did not have to purchase. Any other company that purchased data transport services and equipment to transmit Internet services would be subject to the same tax. Similarly, Comcast must pay the City's telephone utility tax because it generates revenue from providing data transmission services to its customers. There is no discrimination because any other company that generates revenue from data transmission activities is subject to the same tax, regardless of whether the transmission is via "a local telephone network, . . . toll line or channel, cable, microwave, or similar communication or transmission system." SMC 5.30.060(C).
¶ 41 For the foregoing reasons, we reverse the summary judgment granted in favor of Comcast and direct that summary judgment be entered in favor of the City of Seattle.
WE CONCUR: SCHINDLER, A.C.J., and BECKER, J.
NOTES
[1] We also do not decide whether Comcast was required to notify the Attorney General about its constitutional challenge to SMC 5.55.060D.
[2] Comcast also argues that RCW 35.21.714 forbids the City from taxing Internet service as a telephone business. Comcast cites Western Telepage, Inc. v. City of Tacoma, 95 Wash.App. 140, 974 P.2d 1270 (1999), aff'd, 140 Wash.2d 599, 998 P.2d 884 (2000). Neither the statute nor the case precludes the City from taxing data transmission activities as a telephone business.
[3] This is similar to the approach taken by the State in ETA 2029.04.245 regarding the applicability of the ITFA to Washington's taxes on network telephone services related to Internet access. In ETA 2029.04.245, the State declined to adopt an interpretation of the term "Internet Access" and instead focused on whether the State's taxes are exempt under the ITFA's grandfather clause. The Pennsylvania Supreme Court also declined to adopt an interpretation of "Internet Access" and instead concluded that the tax in question was exempt under the ITFA's grandfather clause. Concentric Network Corp. v. Commonwealth of Pennsylvania, 897 A.2d 6, 15 (Penn.2006) ("We need not decide whether application of the Tax Code to Taxpayer's purchases is a tax on Internet access, because we conclude that Tax Code provisions in question were generally imposed and actually enforced prior to October 1, 1998.").
[4] In addition to Rule 155, the City argues that the 1995 memorandum of understanding between Comcast's predecessor and the City also satisfied the ITFA grandfather clause's notice requirement. We conclude that Rule 155 and the Seattle Municipal Code provided adequate notice and that the City generally collected the tax; therefore, we do not decide whether the memorandum qualifies as a public proclamation to Comcast that the City "has interpreted and applied such tax to Internet access services" before October 1, 1998. ITFA, § 1101(d)(1) (2001).
[5] The City again argues that the six percent tax is not a tax on "Internet access." As explained above, we do not have to decide whether the City taxes "Internet access" as the term is defined under the ITFA. Instead, we conclude the tax is not discriminatory.