**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/

**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
SEPTEMBER 30, 2021

*González, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
SEPTEMBER 30, 2021

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| WASHINGTON BANKERS ASSOCIATION, a Washington public benefit corporation; and AMERICAN BANKERS ASSOCIATION, a District of Columbia nonprofit corporation, | ) ) ) ) ) | No. 98760-2 |
| Respondents, | ) ) | |
| v. | ) ) | En Banc |
| STATE OF WASHINGTON; DEPARTMENT OF REVENUE OF THE STATE OF WASHINGTON; and VIKKI SMITH, as Director of the Department of Revenue of the State of Washington, | ) ) ) ) ) ) ) | |
| Appellants. | ) ) | Filed: September 30, 2021 |

MADSEN, J.—This case involves the constitutionality of a business and occupation (B&O) tax. In 2019, the legislature imposed an additional 1.2 percent B&O tax on financial institutions with a consolidated net income of at least $1 billion. LAWS OF 2019, ch. 420, § 2. The tax applies to any financial institution meeting this threshold regardless of whether it is physically located in Washington, and it is apportioned to

No. 98760-2

income from Washington business activity.  Because the tax applies equally to in- and out-of-state institutions and is limited to Washington-related income, it does not discriminate against interstate commerce.  We therefore reverse the trial court and uphold the constitutionality of the tax.

BACKGROUND

The legislature enacted Substitute House Bill 2167 (SHB 2167) in 2019, imposing a graduated B&O tax on corporate income, specifically a 1.2 percent tax on "specified financial institutions."  LAWS OF 2019, ch. 420, § 2; RCW 82.04.29004.  RCW 82.04.29004(1) provides:

> Beginning January 1, 2020, in addition to any other taxes imposed under this chapter, an additional tax is imposed on specified financial institutions. The additional tax is equal to the gross income of the business taxable under RCW 82.04.290(2) multiplied by the rate of 1.2 percent.

Prior to the enactment, financial institutions were subject to a base B&O tax rate of 1.5 percent.  Former RCW 82.04.290(2) (2019).  SHB 2167 increased the 1.5 percent rate to 2.7 percent.  LAWS OF 2019, ch. 420, § 2.  After the enactment, the increased tax rate applied to financial institutions reporting an annual net income of at least $1 billion, measured by the portion of gross income derived from Washington business activity. RCW 82.04.29004(1), (2)(e)(i).[1]  Any financial institution, regardless of whether it is

---

[1] To calculate the amount of a financial institution's gross income subject to B&O taxes, Washington applies a single-factor apportionment method.  *See* RCW 82.04.290(2); WAC 458-20-19404.  Apportionment divides the tax base of a multistate business among the various states in which it does business and is meant to tax only the portion related to the business activity in Washington.  RCW 82.04.460.

2

No. 98760-2

physically located in or out of state, that meets this threshold must pay the increased tax rate. RCW 82.04.29004(2)(d).

Numerous states impose graduated tax rates on a corporation's income, including Alaska, Iowa, and Oregon. *See* ALASKA STAT. § 43.20.011(e); IOWA CODE § 422.33; OR. REV. STAT. § 317.061. In Washington, a B&O tax is an excise tax on gross income imposed for the "privilege of doing business" in this state. *Ford Motor Co. v. City of Seattle*, 160 Wn.2d 32, 39, 156 P.3d 185 (2007). In enacting the B&O tax act, the legislature provided for apportionment[2] of income derived from intrastate and interstate activities. *Crown Zellerbach Corp. v. State*, 45 Wn.2d 749, 762, 278 P.2d 305 (1954). Apportionment allows states to tax the part of an interstate transaction that takes place within the state. *Smith v. State*, 64 Wn.2d 323, 334, 391 P.2d 718 (1964).

For the 1.2 percent B&O tax at issue here, lawmakers made specific findings. LAWS OF 2019, ch. 420, § 1. The legislature found that despite the economic success of Washington industry, Washington families still struggle to meet basic needs while at the same time carrying the burden of funding schools and essential services. *Id.* The disparity in wealth between the highest and lowest income families continues to grow, and the state's regressive tax code disproportionately affects middle and low-income earners. *Id.* To address these disparities, the legislature concluded that "those wealthy

---

[2] "Apportionment" is the "act of allocating or attributing moneys or expenses in a given way, as when a taxpayer allocates part of profits to a particular tax year or part of the use of a personal asset to a business." BLACK'S LAW DICTIONARY 125 (11th ed. 2019).

3

No. 98760-2

few who have profited the most from the recent economic expansion can contribute to the essential services and programs all Washington families need." *Id*.

RCW 82.04.29004 took effect on January 1, 2020. For the first three months of that year, the State received $34 million in revenue from 153 financial institutions, including three Washington-based taxpayers. During the 2020 legislative session, lawmakers also raised the base B&O tax rate from 1.5 percent to 1.75 percent for any businesses (with some exceptions) earning more than $1 million annually in the preceding calendar year. LAWS OF 2020, ch. 2, § 3 (codified at RCW 82.04.290(2)(a)); *see also* FINAL B. REP. ON ENGROSSED SUBSTITUTE S.B. 6492, 66th Leg., Reg. Sess. (Wash. 2019), at 1-2 (legislation enacting the base B&O tax rate increase).

Prior to RCW 82.04.29004's effective date, the Washington Bankers Association and American Bankers Association (collectively the Association) challenged the increased tax rate in a declaratory action on behalf of their members. The Association argued, among other things, that the tax violated the commerce clause of the United States Constitution. On cross motions for summary judgment, the trial court agreed with the Association that the 1.2 percent tax discriminates against out-of-state businesses both in effect and purpose in violation of the commerce clause. The court also agreed that the Association had standing to challenge the tax under the Uniform Declaratory Judgments Act (UDJA), ch. 7.24 RCW. Upon the court's denial of reconsideration, the State appealed both issues to this court. We agreed to retain and decide the case.

4

No. 98760-2

Amici curiae Service Employees International Union, Local 775, et al. submitted briefing (SEIU Am. Br.) in support of the tax.

ANALYSIS

The State seeks review of the trial court's decision on summary judgment that RCW 82.04.29004 violated the dormant commerce clause and that the Association has standing to sue. This court reviews a grant of summary judgment de novo and views all facts in the light most favorable to the party challenging the summary dismissal. *State v. Heckel*, 143 Wn.2d 824, 831-32, 24 P.3d 404 (2001) (citing *Lybbert v. Grant County*, 141 Wn.2d 29, 34, 1 P.3d 1124 (2000)). A legislative act is presumed constitutional and the statute's challenger has the heavy burden to overcome that presumption. *Id*. at 832; *see also Wash. Fed'n of State Emps. v. State*, 127 Wn.2d 544, 558, 901 P.2d 1028 (1995).

I.  The Dormant Commerce Clause

The commerce clause grants Congress the authority "[t]o regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. CONST. art. I, § 8, cl. 3. Implicit in this affirmative grant of power is the negative or "dormant" aspect of the clause: states intrude on this federal power when they enact laws that unduly burden interstate commerce. *Heckel*, 143 Wn.2d at 832 (citing *Franks & Son, Inc. v. State*, 136 Wn.2d 737, 747, 966 P.2d 1232 (1998)).

The United States Supreme Court has interpreted the dormant commerce clause to protect the fluidity of interstate commerce and to prevent states from retreating into economic isolation. *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179-80,

5

No. 98760-2

115 S. Ct. 1331, 131 L. Ed. 2d 261 (1995). To those ends, the Court has invalidated laws awarding benefits to intrastate interests and giving local consumers advantages over out-of-state consumers. *E.g.*, *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 580, 106 S. Ct. 2080, 90 L. Ed. 2d 552 (1986). Such obvious local economic protectionism is antithetical to the dormant commerce clause—the principle that the people of the several states must sink or swim together. *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 578, 117 S. Ct. 1590, 137 L. Ed. 2d 852 (1997); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 523, 55 S. Ct. 497, 79 L. Ed. 1032 (1935).

Regulating interstate commerce is the purview of the federal government, but states retain the authority to regulate matters of local concern, including the power to impose and collect taxes on commerce related to that state. *See, e.g.*, *Maine v. Taylor*, 477 U.S. 131, 138, 106 S. Ct. 2440, 91 L. Ed. 2d 110 (1986) (the states "'retain authority under their general police powers to regulate matters of legitimate local concern'" (internal quotation marks omitted) (quoting *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 36, 100 S. Ct. 2009, 64 L. Ed. 2d 702 (1980))); *Love v. King County*, 181 Wash. 462, 467-68, 44 P.2d 175 (1935) ("State government has the inherent power to tax . . . subject only to constitutional and inherent limitations."); *Chi. Bridge & Iron Co. v. Dep't of Revenue*, 98 Wn.2d 814, 828, 659 P.2d 463 (1983) (states have "'a significant interest in exacting from interstate commerce its fair share of the cost of state government'" (quoting *Dep't of Revenue v. Ass'n of Wash. Stevedoring Cos.*, 435 U.S. 734, 748, 98 S. Ct. 1388, 55 L. Ed. 2d 682 (1978))).

6

No. 98760-2

The command to preserve interstate commerce, however, "has been stated more easily than its object has been attained." *Jefferson Lines*, 514 U.S. at 180. State taxation has proved particularly challenging as the Court's views on the subject have evolved. *See, e.g.*, *id*. at 180-83. In the 19th century, interstate commerce was held to be completely immune from state taxation. *Leloup v. Port of Mobile*, 127 U.S. 640, 648, 8 S. Ct. 1380, 32 L. Ed. 311 (1888). Absolute immunity gave way to a more accommodating but rigid view in which the Court would invalidate a tax in specific circumstances. *Jefferson Lines*, 514 U.S. at 180-81 (noting the Court would overturn taxes when levied on gross receipts from interstate commerce or on the "freight carried" in interstate commerce, but allow a tax measured by gross receipts formally imposed on franchises or in lieu of all taxes on the taxpayer's property). The Court found this test too mechanical and uncertain in its application, ultimately replacing it with a pragmatic approach set out in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S. Ct. 1076, 51 L. Ed 2d 326 (1977). *See Jefferson Lines*, 514 U.S. at 181, 183; *W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 258, 58 S. Ct. 546, 82 L. Ed. 823 (1938) (first applying a pragmatic approach to sustain a state franchise tax).

To determine whether a state may constitutionally tax an out-of-state corporation, the Court established a four-part test that requires a tax to be (1) "applied to an activity with a substantial nexus with the taxing State," (2) "fairly apportioned," (3) nondiscriminatory with respect to interstate commerce, and (4) "fairly related to the services provided by the State." *Complete Auto*, 430 U.S. at 279; *Lamtec Corp. v. Dep't*

7

No. 98760-2

*of Revenue*, 170 Wn.2d 838, 844, 246 P.3d 788 (2011) (applying the *Complete Auto* test).

If a tax fails any one of these requirements, it is invalid. *Ford Motor Co.*, 160 Wn.2d at

48. The Court has consistently applied the *Complete Auto* test to state taxation schemes.

*Jefferson Lines*, 514 U.S. at 183.

In the present case, the only issue before us is whether RCW 82.04.29004 is

discriminatory. A tax may be discriminatory on its face, in purpose, or by having the

effect of unduly burdening interstate commerce. *See Heckel*, 143 Wn.2d at 832;

*Amerada Hess Corp. v. Dir., Div. of Taxation*, 490 U.S. 66, 75, 109 S. Ct. 1617, 104 L.

Ed. 2d 58 (1989). "Discrimination" means "'differential treatment of in-state and out-of-

state economic interests that benefits the former and burdens the latter.'" *Filo Foods,*

*LLC v. City of SeaTac*, 183 Wn.2d 770, 808, 357 P.3d 1040 (2015) (internal quotation

marks omitted) (quoting *United Haulers Ass'n v. Oneida-Herkimer Solid Waste Mgmt.*

*Auth.*, 550 U.S. 330, 338, 127 S. Ct. 1786, 167 L. Ed. 2d 655 (2007)). A discriminatory

law is "virtually per se" invalid. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624,

98 S. Ct. 2531, 57 L. Ed. 2d 475 (1978).

If the law is facially neutral, applying impartially to both in-state and out-of-state

entities, but has "mild disparate effects and potential neutral justifications," the law is

generally analyzed under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25

L. Ed. 2d 174 (1970). *Nat'l Paint & Coatings Ass'n v. City of Chicago*, 45 F.3d 1124,

1131 (7th Cir. 1995). *Pike* established a balancing test requiring a court to weigh the

burden on interstate commerce against local interests. *Park Pet Shop, Inc. v. City of*

8

No. 98760-2

*Chicago*, 872 F.3d 495, 501 (7th Cir. 2017); *Heckel*, 143 Wn.2d at 832. A nondiscriminatory statute is valid unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits." *Pike*, 397 U.S. at 142.

Reviewing courts ask whether the challenged statute is discriminatory on its face, in effect, or in purpose. If so, the provision is per se invalid. If not, courts balance the incidental burdens imposed on commerce against the benefits to local interests. *Heckel*, 143 Wn.2d at 832.

### A. Facial Discrimination

The Association asserts that RCW 82.04.29004's increased tax rate is facially discriminatory, as argued in its motion for summary judgment before the trial court. The Association's supplemental briefing in this court focuses only on the purpose and effect of the tax. Because incorporating an argument solely by reference is insufficient, the issue is not properly before us. *See State v. Gamble*, 168 Wn.2d 161, 180, 225 P.3d 973 (2010) ("argument incorporated by reference to other briefing is not properly before this court"); *Diversified Wood Recycling, Inc. v. Johnson*, 161 Wn. App. 859, 890, 251 P.3d 293 (2011) ("We do not permit litigants to use incorporation by reference as a means to argue on appeal or to escape the page limits for briefs set forth in RAP 10.4(b).").

Nevertheless, we agree with the trial court that the tax is facially neutral. "A facially discriminatory law textually identifies out-of-state persons or entities and grants them unfavorable treatment." *Filo Foods*, 183 Wn.2d at 809 (citing *Camps Newfound/Owatonna*, 520 U.S. at 568 & n.2). RCW 82.04.29004 imposes the challenged

9

No. 98760-2

tax on *any* financial institution meeting the $1 billion consolidated net income threshold.

On its face, the statute does not distinguish between in-state and out-of-state taxpayers,

*see* RCW 82.04.29004(1), (2), thus it does not facially discriminate against interstate

commerce.  *Filo Foods*, 183 Wn.2d at 809.

B.  Discriminatory Effect

Not only is RCW 82.04.29004 nondiscriminatory on its face, it does not

discriminate in effect.  Contrary to the Association's argument, disproportionate

economic effect on taxpayers does not render a tax discriminatory.  The Supreme Court

has routinely upheld state statutes against discriminatory effect claims when such laws

mainly and even *solely* apply to out-of-state interests.  *E.g.*, *CTS Corp. v. Dynamics*

*Corp. of Am.*, 481 U.S. 69, 88, 107 S. Ct. 1637, 95 L. Ed. 2d 67 (1987); *Commonwealth*

*Edison Co. v. Montana*, 453 U.S. 609, 618-19, 101 S. Ct. 2946, 69 L. Ed. 2d 884 (1981);

*Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 125-26, 98 S. Ct. 2207, 57 L. Ed.

2d 91 (1978); *Oliver Iron Mining Co. v. Lord*, 262 U.S. 172, 177-79, 43 S. Ct. 526, 67 L.

Ed. 929 (1923); *Heisler v. Thomas Colliery Co.*, 260 U.S. 245, 258-59, 43 S. Ct. 83, 67

L. Ed. 237 (1922).

In *Commonwealth Edison*, the Court reviewed a severance tax on coal mined in

Montana.  Companies challenged the tax as violating the dormant commerce clause for

reasons similar to the Association in the present case: 90 percent of Montana coal was

shipped outside of the state, and the tax consequently shifted the tax burden to those out-

of-state purchasers.  453 U.S. at 617-18.  The Court rejected this claim, explaining that all

10

No. 98760-2

consumers were charged the same tax rate regardless of the destination of the coal. *Id*. at 618. This "evenhanded formula" was not the type of differential tax treatment found discriminatory in other cases. *Id*. Instead, the Court noted, the core of the discrimination claim was that the tax burden fell primarily to out-of-state consumers. *Id*. Such an argument had already been raised and dismissed in *Heisler*, 260 U.S. at 258-59. *Commonwealth Edison* shared *Heisler*'s "misgivings about judging the validity of a state tax" based on a state's "monopoly position" or its "exportation of the tax burden out of State." 453 U.S. at 618 (internal quotation marks omitted).

The Court went on to explain that the purpose of the commerce clause was to "'create an area of free trade among the several States,'" making the borders between states irrelevant. *Id*. (quoting *McLeod v. J.E. Dilworth Co.*, 322 U.S. 327, 330, 64 S. Ct. 1023, 88 L. Ed. 1304 (1944)). Invaliding the tax merely because Montana coal crossed borders ordinarily considered irrelevant would have required an unwarranted departure from the Court's rationale in previous discrimination cases. *Id*. at 618-19. The Court concluded that the Montana tax scheme did not discriminate against interstate commerce because the burden was borne according to the amount of coal consumed, not to any distinction between in-state and out-of-state consumers. *Id*. at 619.

In *Exxon*, the Court held that a state law prohibiting all petroleum producers and refiners from operating retail service stations within Maryland did not violate the dormant commerce clause because it did not create any barrier against interstate commerce. 437 U.S. at 126. Exxon, along with other oil companies, argued that the statute effectively

11

No. 98760-2

protected in-state independent dealers from out-of-state competition. *Id*. at 125. The companies relied on the fact that only out-of-state companies were affected. *Id*. The Court rejected this argument and held that this effect "by itself" does not establish discrimination against interstate commerce. *Id*. at 126. The Court considered three factors in reaching this conclusion: the law did not prohibit the flow of interstate goods, place added costs on interstate goods, or distinguish between in-state and out-of-state companies in the retail market. *Id*. The absence of "any" of these factors distinguished the case from those found to discriminate against interstate commerce. *Id*.

*Commonwealth Edison* and *Exxon* are instructive here. Similar to the Montana tax in *Commonwealth Edison*, Washington imposed the challenged tax on resident and nonresident institutions evenhandedly. *See* 453 U.S. at 618; *cf. Bacchus Imps., Ltd. v. Dias*, 468 U.S. 263, 268, 104 S. Ct. 3049, 82 L. Ed. 2d 200 (1984) (invalidating a law providing a direct commercial advantage to local business by granting a tax exemption for liquors produced in Hawaii). *All* financial institutions operating in-state that generate net income of $1 billion pay the challenged B&O tax. Additionally, the burden of the tax depends on net income just as the burden in *Commonwealth Edison* depended on the amount of coal consumed—that is, something other than a distinction between in-state and out-of-state consumers. *See* 453 U.S. at 619. As in *Exxon*, the challenged tax creates no barriers against interstate financial institutions: the tax does not prevent financial institutions from entering or operating in Washington; it does not prohibit the flow of

12

No. 98760-2

interstate goods or distinguish between in-state and out-of-state companies in the retail market. 437 U.S. at 126.

The rationale of *Commonwealth Edison* and *Exxon* is also applicable. In both cases, the Court dismissed the argument that disparate economic effect constituted discrimination, even when a challenged tax affected *only* out-of-state interests. *See Commonwealth Edison*, 453 U.S. at 618; *Exxon*, 437 U.S. at 126. Here, in- and out-of-state financial institutions paid the increased tax rate. Clerk's Papers (CP) at 371 (153 financial institutions paid the added 1.2 percent tax, including three based in Washington). That the tax is borne primarily by out-of-state institutions is of no moment under *Commonwealth Edison* and *Exxon*. Indeed, even if no Washington-based institutions qualified, the tax would not offend the dormant commerce clause. *See Exxon*, 437 U.S. at 126 (affirming a law applicable only to out-of-state oil companies). To accept the Association's argument that the tax is protectionist because it disproportionately burdens out-of-state institutions conflicts with the Court's discrimination cases. *See id*.; *Commonwealth Edison*, 453 U.S. at 618.

The Association attempts to overcome *Commonwealth Edison*'s rejection of its disproportionate effect argument by distinguishing the "indirect, downstream effect[]" of the Montana tax from the "direct effect" of the 1.2 percent tax, which favors in-state interests over out-of-state interests. Br. of Resp'ts at 29-30. Because the Montana tax was levied against in-state coal producers but passed on to out-of-state purchasers, the Association contends *Commonwealth Edison*'s holding is limited to an indirect tax effect.

13

No. 98760-2

The Association is incorrect.  The Montana coal producers passed the tax on in costs to out-of-state consumers as a business choice.  The tax here is levied directly on out-of-state institutions.  Yet the result is the same: an increase in taxes increases the costs to the consumer.  Ultimately the affected payers of both taxes are treated equally.  The coal tax was generally applicable to all coal purchasers, and the increased tax rate applies to all financial institutions meeting the income threshold.  *See Commonwealth Edison*, 453 U.S. at 618.

The Association also argues that *Exxon* is inapplicable.  The *Exxon* Court upheld a prohibition on operating retail gas stations because it did not give local retailers a competitive advantage by, among other things, placing added costs on interstate competitors.  437 U.S. at 126.  The 1.2 percent tax, according to the Association, increases the cost of conducting business in Washington for out-of-state institutions.  CP at 298-309 (arguing the tax constitutes a "significant expense that increases" a financial institution's "costs of doing business in the state," which "can influence pricing, investment and other business decisions").  We reject this argument.

First, raising the cost of doing business alone does not show a discriminatory effect.  The *Exxon* Court considered added costs as one of a number of factors that could create barriers to interstate commerce.  437 U.S. at 126 (other factors include prohibiting the flow of interstate goods and distinguishing between in- and out-of-state companies in the retail market).  The Court explicitly observed that the "absence of *any* of these factors fully distinguishes this case from those in which a State has been found to have

14

No. 98760-2

discriminated against interstate commerce." *Id*. (emphasis added). In *Hunt v.*

*Washington Apple Advertising Commission*, 432 U.S. 333, 97 S. Ct. 2434, 53 L. Ed. 2d

383 (1977), for example, the challenged statute increased business costs for out-of-state

apple dealers and "in various other ways, favored the in-state dealer in the local market."

*Exxon*, 437 U.S. at 126 (citing *Hunt*, 432 U.S. at 351-52). Unlike *Hunt*, the Association

offers no other evidence, apart from added cost, that the challenged tax burdens interstate

commerce. In any event, it has been long recognized that it is "'not the purpose of the

commerce clause to relieve those engaged in interstate commerce from their just share of

state tax burden even though it increases the cost of doing the business.'" *Chi. Bridge &*

*Iron*, 98 Wn.2d at 825-26 (internal quotation marks omitted) (quoting *Gen. Motors Corp.*

*v. Washington*, 377 U.S. 436, 439, 84 S. Ct. 1564, 12 L. Ed. 2d 430 (1964), *overruled in*

*part on other grounds by Tyler Pipe Indus., Inc. v. Wash. State Dep't of Revenue*, 483

U.S. 232, 248, 107 S. Ct. 2810, 97 L. Ed. 2d 199 (1987)).

Second, evidence of increased cost is not evidence of discriminatory effect on out-

of-state institutions. Qualifying in-state financial institutions would also presumably

suffer increased costs as a result of paying the increased tax.

The Association's reliance on *Bacchus Imports*, 468 U.S. at 268-70, *Family*

*Winemakers of California v. Jenkins*, 592 F.3d 1, 9-14 (1st Cir. 2010), and *Cachia v.*

*Islamorada*, 542 F.3d 839, 843 (11th Cir. 2008), is misplaced. *Bacchus Imports*

concerned a Hawaii tax exemption applicable only to locally produced liquor and fruit

wine. 468 U.S. at 265. The Court concluded that the exemption discriminated on its face

15

No. 98760-2

against interstate commerce by bestowing a commercial advantage on local producers, despite the tax applying to all Hawaii wholesalers and its burden borne by all Hawaii consumers. *Id*. at 267-68. The legislature's motivation for the exemption was to aid Hawaiian industry, and its effect was clearly discriminatory because it applied only to local beverages. *Id*. at 270-71. The 1.2 percent tax, in contrast, contains no such exemptions for local financial institutions and eligibility to pay the tax is dependent on income rather than a uniquely in-state factor such as *Bacchus Imports*' liquor and fruit wine.

In *Family Winemakers*, Massachusetts created a regulatory scheme for wineries to ship wine to in-state buyers. 592 F.3d at 4. The law distinguished between large wineries (producing more than 30,000 gallons of wine) and small wineries (producing less than 30,000 gallons). *Id*. Small wineries could sell their wines in three ways simultaneously: ship directly to consumers, sell through wholesale, or sell through retail distribution; whereas large wineries were forced to choose between either buying a special license to ship directly to consumers or using wholesale distribution. *Id*. at 4, 8. All Massachusetts wineries qualified as small and most out-of-state wineries were considered large. *Id*. at 4. The First Circuit Court of Appeals held the scheme was discriminatory in effect because the gallonage cap changed the "competitive balance between in-state and out-of-state wineries in a way that benefits Massachusetts's wineries and significantly burdens out-of-state competitors." *Id*. at 5. The "'effect of [the law] is to cause local goods to constitute a larger share, and goods with an out-of-state source to

16

No. 98760-2

constitute a smaller share, of the total sales in the market.'" *Id*. at 10 (quoting *Exxon*, 437 U.S. at 126 n.16).

Unlike the distribution scheme in *Family Winemakers*, the effect of the challenged tax in this case does not shift the competitive balance in favor of local interests. The Massachusetts' law allowed small wineries to utilize all available distribution methods while forcing large wineries to choose only one. *See id*. at 11-12. This "clear competitive advantage" for small wineries was unavailable to large wineries and "artificially limit[ed] the playing field." *Id*. Here, the tax offers no such clear competitive advantage to local financial institutions; rather, qualifying Washington-based institutions must pay the same increased tax rate as out-of-state institutions. In effect, all prosperous financial institutions compete on the same footing. *Cf. id*. at 12. All less-prosperous financial institutions would also compete on the same footing; resident and nonresident institutions falling below the income threshold would *not* be subject to the additional B&O tax. Thus, the tax does nothing to artificially limit the playing field or grant benefits to local institutions denied to their out-of-state competitors.

*Cachia* is similarly unhelpful to the Association. There, a Florida law prohibited large chain or "formula" restaurants from operating in the state. 542 F.3d at 841-42. The Eleventh Circuit concluded the provision discriminated in practical effect against interstate commerce. *Id*. at 842. The court observed that the provision did not "simply raise the costs of operating a formula restaurant," it entirely prohibited such restaurants from opening and preventing the entry of the business into competition in the local

17

market. *Id*. at 842-43. *Cachia* is easily distinguishable from the current case because the challenged tax does not prevent out-of-state institutions from operating in Washington, let alone wholly preclude them from entering the state market. *Cf. id*. at 842.

The tax also survives the claim that it unconstitutionally burdens out-of-state institutions based on their interstate commercial activity. The Association notes that only institutions participating in national and global commerce generate the substantial income required to qualify for the increased tax rate. Yet, "[i]t is a truism that the mere act of carrying on business in interstate commerce does not exempt a corporation from state taxation." *Colonial Pipeline Co. v. Traigle*, 421 U.S. 100, 108, 95 S. Ct 1538, 44 L. Ed. 2d 1 (1975). The Court has often upheld "nondiscriminatory, *properly apportioned* state corporate taxes upon foreign corporations doing an exclusively interstate business when the tax is related to a corporation's local activities and the State has provided benefits and protections for those activities for which it is justified in asking a fair and reasonable return." *Id*. (emphasis added) (citing *Gen. Motors Corp.*, 377 U.S. 436; *Memphis Nat. Gas Co. v. Stone*, 335 U.S. 80, 68 S. Ct. 1475, 92 L. Ed. 1832 (1948); *cf. Spector Motor Serv., Inc. v. O'Connor*, 340 U.S. 602, 71 S. Ct. 508, 95 L. Ed. 573 (1951), *overruled by Complete Auto Transit*, 430 U.S. at 288-89).

As noted, a B&O tax is an excise tax on gross income imposed for the "privilege of doing business" in Washington. *Ford Motor Co.*, 160 Wn.2d at 39. The legislature provided for apportionment of income derived from intrastate and interstate activities when enacting the B&O tax act. *Crown Zellerbach Corp.*, 45 Wn.2d at 762.

18

No. 98760-2

Apportionment allows states to tax the part of an interstate transaction that takes place within the state. *Smith*, 64 Wn.2d at 334.

RCW 82.04.29004's 1.2 percent increase in tax liability, an additional B&O tax, is not measured against a financial institution's national or global income. It is limited (apportioned) to only the income associated with Washington business activity. RCW 82.04.29004(1) (stating that "[t]he additional tax is equal to the gross income of the business taxable under RCW 82.04.290(2) multiplied by the rate of 1.2 percent").[3] The Court recognized that for interstate commerce, "the anti-discrimination principle has not in practice required much in addition to the requirement of fair apportionment." *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 171, 103 S. Ct. 2933, 77 L. Ed. 2d 545 (1983); *see also Trinova Corp. v. Mich. Dep't of Treasury*, 498 U.S. 358, 384-85, 111 S. Ct. 818, 112 L. Ed. 2d 884 (1991) (explaining that the commerce clause requires more than facial neutrality and fair apportionment provides that "something more").[4]

---

[3] The State provides a useful equation illustrating how RCW 82.04.29004 operates: a financial institution located outside of Washington generates a gross income of $2 billion, earning $40 million of that income from Washington business activity. Reply Br. of Appellants at 10. Dividing the Washington income by the gross income ($40 million/$2 billion) equals .02, or a 2 percent apportionment factor. *Id.* Multiplying the Washington apportioned income ($40 million) by the 1.2 percent rate results in a tax liability of $480,000. *Id.* This equation remains the same regardless of the financial institution's physical location, inside or outside of Washington.

[4] The apportionment of the tax is critical to its constitutionality, distinguishing this case from *Fulton Corp. v. Faulkner*, which invalidated a law that taxed "stock only to the degree that its issuing corporation participates in interstate commerce." 516 U.S. 325, 333, 116 S. Ct. 848, 133 L. Ed. 2d 796 (1996).

19

No. 98760-2

The Association does not meaningfully dispute that the tax is properly apportioned. *See Trinova*, 498 U.S. at 380 (the burden of showing that a tax is not fairly apportioned rests on the taxpayer). Instead, the Association emphasizes that even apportioned taxes can be discriminatory. The Association is correct insofar as it properly recognizes that a fair apportionment methodology does not necessarily "insulate" a state tax from impermissible discrimination. *See Westinghouse Elec. Corp. v. Tully*, 466 U.S. 388, 398-99, 104 S. Ct. 1856, 80 L. Ed. 2d 388 (1984). But discrimination requires more than mere assertion that it exists. One method the Court has used to determine whether a tax is impermissibly discriminatory is the internal consistency test.

Used in both the apportionment and discrimination contexts, the internal consistency test requires a state tax to be consistent such that if it was applied by every jurisdiction, there would be no impermissible interference with free trade by means of multiple taxation. *Gen. Motors Corp. v. City of Seattle*, 107 Wn. App. 42, 56, 25 P.3d 1022 (2001) (citing *Jefferson Lines*, 514 U.S. at 185); *see also Armco, Inc. v. Hardesty*, 467 U.S. 638, 644, 104 S. Ct 2620, 81 L. Ed 2d 540 (1984) (extending internal consistency test to interstate commerce discrimination claims). The test focuses on the structural integrity of the tax, rather than the degree to which it reflects economic reality. *Gen. Motors Corp.*, 107 Wn. App. at 56; *see also Comptroller of Treasury v. Wynne*, 575 U.S. 542, 561-64, 135 S. Ct. 1787, 191 L. Ed. 2d 813 (2015) (noting the internal consistency test's application to numerous taxation schemes).

20

No. 98760-2

The challenged tax satisfies the internal consistency test. Under RCW 82.04.29004(1), a financial institution's gross income from activities within the taxing state is multiplied by 1.2 percent. Multiple taxation would not occur if every other state adopted this scheme because the tax is measured by the gross income generated *only* in the taxing state. *See* RCW 82.04.29004(1). The physical location of the taxpayer is irrelevant. *See Armco*, 467 U.S. at 644-45 (West Virginia tax system was not internally consistent because liability for a tax depended on where the goods were manufactured).[5]

As noted, the Association does not meaningfully dispute apportionment of the tax. Nor does the Association contest the right of all states to set differential tax rates. The internal consistency test asks whether an affected taxpayer would be taxed twice by a challenged law or regulation. *E.g.*, *Wynne*, 575 U.S. at 561-62. If every state followed Washington's lead and charged a 2.7 percent B&O tax rate (or higher) for every financial institution doing business within its boundaries, the impact would not result in double taxation; states would tax income related only to that state. Such an outcome does not

---

[5] The Association argued below that RCW 82.04.29004 fails the internal consistency test. According to the Association, like the invalidated alternative minimum tax in *Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 126 (1st Cir. 2016), the 1.2 percent tax would disadvantage corporations doing business across state lines relative to those consolidated in one state principally because multistate corporations could not enjoy functional integration, centralization of management, and economies of scale in their interstate business model. But RCW 82.04.29004 does not tax transactions occurring across state lines; the statute is apportioned only to income related to Washington business activity. Eligibility to pay a tax based on a specific income is not tantamount to *measuring* tax liability on interstate income. *Cf. Fulton*, 516 U.S. at 328, 333 (invaliding a tax that imposed no liability on taxpayers owning stock in an exclusively in-state business while taxing those holding stock in interstate business). Further, the Association does not clarify how the tax would deprive institutions of functional integration, centralized management, or economies of scale.

21

No. 98760-2

offend the commerce clause. *See id*. at 564-65 (Maryland income tax law failed to offer credit for other states' taxes resulting in impermissible double taxation).

Instead, the Association contends that if every state adopted the fairly apportioned tax then "the cumulative effect of the huge increase in the tax *rate* in every state would be a massive increase in the tax burden on interstate commerce" and "'eat[] away' at the earnings of the targeted financial institutions without burdening their strictly local competition." Br. of Resp'ts at 32 (alteration in original) (citing *Nippert v. City of Richmond*, 327 U.S. 416, 430-31, 66 S. Ct. 586, 90 L. Ed. 760 (1946)). This is essentially the same increasing-the-cost-of-business argument the Association already raised and that *Exxon*, 437 U.S. at 126, and *General Motors*, 377 U.S. at 439, resolve: the commerce clause does not release those engaged in interstate commerce from their just share of state tax burden even though it increases the costs of doing business. *Chi. Bridge & Iron*, 98 Wn.2d at 825-26.

The remaining cases cited by the Association are inapposite. *Camps Newfound/Owatonna* concerned a facially discriminatory statute that exempted charities serving mostly in-state residents from certain property taxes, but the exemption was limited or unavailable to charities that served mostly out-of-state clientele. 520 U.S. at 568. This exemption impermissibly distinguished between groups serving those in interstate commerce and those serving only in-state residents. *Id*. at 575-76. In contrast, the 1.2 percent tax is not facially discriminatory, nor does the tax "operate[] principally for the benefit" of Washington institutions because all qualifying entities must pay the

22

No. 98760-2

additional B&O tax regardless of whether the institution is located in this state or another. *See id.* at 567; RCW 82.04.29004(1). Moreover, the tax does not distinguish based on the residency of consumers. An institution that generates its revenue exclusively through Washington business activity would still be subject to the increased tax rate, provided it meets the income threshold.

*Wal-Mart Puerto Rico, Inc. v. Zaragoza-Gomez*, 834 F.3d 110, 126 (1st Cir. 2016), concerned an alternative minimum tax imposed on goods sold or transferred to a corporate taxpayer by a related party or home office outside of Puerto Rico. *Id*. at 113. The tax applied only to transactions between a Puerto Rico taxpayer and a related entity outside the territory. *Id*. at 114. The First Circuit concluded that the tax was discriminatory both on its face and in effect because it applied to interjurisdictional transfers in a corporate family and did not apply to transfers within Puerto Rico, resulting in differential treatment of intra- and interstate economic interests. *Id*. at 126 (citing *Family Winemakers*, 592 F.3d at 9). Further, the tax failed the internal consistency test. *Id*. RCW 82.04.29004, however, does not tax cross-border transactions. Eligibility to pay the increased tax rate is determined based on net income, and the tax is apportioned only to the activity related to Washington. The alternative minimum tax applied only to interjurisdictional transfers, whereas the 1.2 percent tax applies to institutions without regard to where they do business (in or outside of the state); the only requirement is the income threshold. RCW 82.04.29004(1). Finally, unlike the tax in *Wal-Mart Puerto Rico*, the tax in this case satisfies the internal consistency test.

23

No. 98760-2

The Association does not demonstrate that the challenged tax discriminates in effect against interstate commerce. *Hughes v. Oklahoma*, 441 U.S. 322, 336, 99 S. Ct. 1727, 60 L. Ed. 2d 250 (1979). Instead, the tax applies equally to in- and out-of-state entities and is limited to the revenue related to Washington business activity. *See Commonwealth Edison*, 453 U.S. at 617-18; *Complete Auto*, 430 U.S. at 287 (sustaining "'nondiscriminatory, properly apportioned . . . taxes'" on corporations engaging in "'exclusively interstate business when the tax is related to a corporation's local activities'" (quoting *Colonial Pipeline Co.*, 421 U.S. at 108)). Accordingly, we reverse the trial court's conclusion that the tax discriminates against interstate commerce in effect.

### C. Discriminatory Purpose

RCW 82.04.29004 was enacted for an express, nondiscriminatory purpose: to address disparities in wealth and income and to fix Washington's regressive tax code, the legislature imposed the increased tax rate on the "wealthy few who have profited the most from the recent economic expansion" and "can contribute to the essential services and programs all Washington families need." LAWS OF 2019, ch. 420, § 1.

The Association, however, argues that the legislature acted with obvious discriminatory purpose in enacting the increased tax rate. To make this claim, the Association singles out individual lawmakers' statements, mischaracterizes the prime sponsor's remarks, and dismisses the explicit legislative findings and purpose of the tax measure.

24

No. 98760-2

As with discriminatory effect, the party challenging a regulation bears the burden of establishing discriminatory purpose under the commerce clause. *Hughes*, 441 U.S. at 336. Courts "assume that the objectives articulated by the legislature are actual purposes of the statute, unless an examination of the circumstances forces us to conclude that they 'could not have been a goal of the legislation.'" *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 463 n.7, 101 S. Ct. 715, 66 L. Ed. 2d 659 (1981) (quoting *Weinberger v. Wiesenfeld*, 420 U.S. 636, 648 n.16, 95 S. Ct. 1225, 43 L. Ed. 2d 514 (1975)). We are not bound by the name, description, or characterization of a law given by the legislature. *Hughes*, 441 U.S. at 336. When reviewing a law for discriminatory intent under the commerce clause, the Ninth Circuit begins with the statutory language and the "'assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 401 (9th Cir. 2015) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 175-76, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009)). The preamble or statement of intent can be crucial to our interpretation of a statute. *Spokane County Health Dist. v. Brockett*, 120 Wn.2d 140, 151, 839 P.2d 324 (1992).

As does the Ninth Circuit, we look first to the text to discern legislative intent. *Int'l Franchise Ass'n*, 803 F.3d at 401. Here, the text of SHB 2167 demonstrates the State's legitimate, nondiscriminatory purpose. The bill's preamble recognizes that Washington families bear the burden of funding essential services despite a disproportionate tax system and ever growing wealth and income disparities. LAWS OF

No. 98760-2

2019, ch. 420, § 1. In response, the legislature asked the wealthy few to contribute more to funding essential services and programs to the benefit of all Washingtonians. *See id*. The express intent of the legislature in enacting SHB 2167 was not to penalize out-of-state financial institutions but to raise revenue for state services by imposing a progressive tax on the most prosperous taxpayers.

In addition to the statutory language, courts also consult legislative history to determine whether an action was motivated by discriminatory purpose. *Int'l Franchise Ass'n*, 803 F.3d at 402 n.4 (citing *Kassel v. Consol. Freightways Corp.*, 450 U.S. 662, 683-84, 101 S. Ct. 1309, 67 L. Ed. 2d 580 (1981) (Brennan, J., concurring); *Dean Milk Co. v. City of Madison*, 340 U.S. 349, 354-55, 71 S. Ct. 295, 95 L. Ed. 329 (1951); *Edwards v. Aguillard*, 482 U.S. 578, 594, 107 S. Ct. 2573, 96 L. Ed. 2d 510 (1987) (plain meaning viewed against context and legislative history can control determination of legislative purpose)). The legislative history of RCW 82.04.29004 also supports the nondiscriminatory purpose of the tax.

The prime sponsor of SHB 2167, Representative Gael Tarleton, spoke extensively on the measure during the House floor debate. Most tellingly, Representative Tarleton reiterated that "what we are trying to do here is to ensure that we are raising revenue to benefit all of the people of Washington State for an operating budget." H. FLOOR DEB., 66th Leg., Reg. Sess. (Apr. 27, 2019), at 18 min., 11 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org. While "the views of a sponsor of legislation are by no means conclusive, they are entitled to considerable

26

weight." *Carlin Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 749 F.2d 113, 116 n.7 (2d Cir. 1984); *see also Wash. State Leg. v. Lowry*, 131 Wn.2d 309, 326, 931 P.2d 885 (1997) (noting that the comments of a legislative sponsor are "noteworthy," if not conclusive, as to a statute's plain meaning).

The Association relies heavily on statements from Representative Tarleton to demonstrate discriminatory intent. Quoting Representative Tarleton's debate remarks, the Association claims her intent was to "encourage a 'resurgence' of 'local banks'—to 'help the community banks and the small credit unions' that 'participat[ed] in the local economy'—and to punish the 'largest institutions' doing 'business all over the world' for not showing the same 'commitment to the local communities' or sufficiently 'invest[ing]' in 'local economies.'" Br. of Resp'ts at 34 (alterations in original) (quoting H. FLOOR DEB., *supra*, at 6 min., 25 sec. through 6 min., 34 sec., 8 min., 15 sec. through 9 min., 6 sec., 23 min., 30 sec. through 23 min., 40 sec.). The Association offers these statements out of context. The quoted statements came in response to proposed amendments that would have provided credits to financial institutions on both B&O taxes and the challenged tax, none of which were adopted. *See* H. FLOOR DEB., *supra*, at 6 min., 25 sec. through 6 min., 34 sec. (responding to amendment no. 868); 8 min., 6 sec. through 9 min., 8 sec. (responding to amendment no. 871); 23 min., 18 sec. through 23 min., 45 sec. (responding to amendment no. 874).[6] For example, the author of amendment 868 stated

---

[6] The House amendments would have provided tax credits to financial institutions on interest received on loans issued by new branches of banks in underserved neighborhoods, on public deposits, and on agricultural loans. SHB 2167, H. amends. 868, 871, 874.

that it was intended to encourage large financial institutions to reopen brick-and-mortar branches in rural areas of the state. *Id*. at 4 min., 10 sec. Representative Tarleton responded that small local banks have historically filled the vacancy in underserved areas and that she would rather see the amendment's incentives offered to "help the community banks and the small credit unions." *Id*. at 5 min., 55 sec. through 6 min., 35 sec.

Similarly, the statement on a "resurgence" of "local banks" relates to amendment 871, which would have provided a tax credit for financial institutions on the interest received on public deposits. Seeking a no vote on the amendment, Representative Tarleton explained that if financial institutions chose not to invest in local economies, this was a business practice choice and that she was unconvinced that the amendment's tax credit would be reinvested in Washington communities. *Id*. at 8 min., 6 sec. Instead, Representative Tarleton stated, she would rather see local banks receive such tax incentives and a "resurgence" of their participation in the local economy. *Id*. at 8 min., 6 sec. through 9 min., 6 sec.

In sum, Representative Tarleton's comments are far from "parochial[]" evidence of "discrimination against interstate commerce." Br. of Resp'ts at 34. The comments relied on by the Association are irrelevant to the purpose of SHB 2167; they related to proposed amendments that would have provided B&O tax credits contrary to the goal of the underlying legislation. Rather, Representative Tarleton's remarks on SHB 2167 echo precisely what the text of that measure says: in order to fund essential services and to address the state's regressive tax code, the legislature imposed an additional 1.2 percent

28

No. 98760-2

tax on the wealthy few, in this case, financial institutions generating a net income of $1 billion.  *See* LAWS OF 2019, ch. 420, §§ 1-2.

Individual statements of legislators also support SHB 2167's express statement of purpose.  Senator Christine Rolfes stated that the legislation was intended to "rais[e] the B&O tax rate on the largest banks in the world," and while "small community banks and credit unions would not be impacted" "if any of those are Washington State banks, *good for them if they've hit the threshold*."  S. FLOOR DEB., 66th Leg., Reg. Sess. (Apr. 28, 2019), at 3 hr., 1 min., 2 sec., *video recording by* TVW, Washington State's Public Affairs Network, http://www.tvw.org (emphasis added).  *But see* CP at 223 ("House Democratic Caucus End of Session Report" noting the tax "does not impact community banks or credit unions").[7]  Senator Rolfes further noted that Washington's tax code is the "most unfair in the nation" and that the challenged tax would "help fix our broken system."  S. FLOOR DEB., *supra*, at 3 hr., 2 min., 22 sec.

Legislators who opposed the measure voiced various concerns ranging from the consequences of increasing taxes, to the timing of the bill's introduction, as well as its

---

[7] As additional evidence of discriminatory intent, the Association cites to "talking points" for SHB 2167, which state the tax would not affect local banks and would in fact "help increase their competitiveness with big banks."  CP at 225.  These talking points provide scant interpretive value in discerning *legislative* intent.  The statements appear to have been drafted by partisan staff and do not necessarily reflect the views of individual legislators, much less the legislature as a whole.  *See id*. (e-mail communication with talking points from communications staffers); *see also Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 337 (4th Cir. 2001) (relying on press releases from the lawmaker who introduced the challenged legislation).  Moreover, the talking points offer little persuasive evidence of discriminatory intent when weighed against the explicit, nondiscriminatory purpose outlined in the text of SHB 2167 and echoed by lawmakers on the floors of the House of Representatives and the Senate.

validity under the dormant commerce clause. Br. of Resp'ts at 6, 8-10 (quoting

lawmakers who warned the bill "'clearly seems to violate the Commerce Clause'"

(quoting S. FLOOR DEB., *supra*, at 1 hr., 39 min., 59 sec.)).[8] The majority of these

concerns go to the wisdom of enacting SHB 2167 rather than evidencing an intent to

discriminate against interstate commerce.

While lawmakers' concerns about the constitutionality of SHB 2167 may be

moderately "instructive" in determining legislative intent, *In re Marriage of Kovacs*, 121

Wn.2d 795, 807-08, 854 P.2d 629 (1993), they do not exist in a vacuum. They must be

considered together with the statements of other legislators. *See State v. Heiskell*, 129

Wn.2d 113, 119, 916 P.2d 366 (1996) (citing colloquy between bill sponsor and another

legislator as evidence of legislative intent). In so doing here, the statements of the prime

sponsor of SHB 2167 guide our determination. Representative Tarleton stated explicitly

that SHB 2167 was intended to raise "revenue to benefit all of the people of Washington

State" and "to address the upside down tax code that we have . . . this tax on megabanks

---

[8] In support of its claim that lawmakers shared the goal of protecting local industries from out-of-state competition, the Association declares that the State identified no legislator "who stood to defend [SHB 2167's] constitutionality." Br. of Resp'ts at 38. This point is not well taken. First, it is not incumbent on the State to present evidence of a measure's constitutionality. Statutes are presumed constitutional, *Heckel*, 143 Wn.2d at 832, and the party challenging it bears the burden of establishing discriminatory purpose. *Hughes*, 441 U.S. at 336. Second, though the State did not provide legislative comments in support of constitutionality, the public record does. Senator Marko Liias spoke on the constitutionality of SHB 2167, citing the *Complete Auto Transit* decision. S. FLOOR DEB., *supra*, at 3 hr., 15 min., 5 sec. Senator Liias explained that the Department of Revenue uses a complex model to fairly apportion B&O taxes to business activity in Washington. *Id.* As to whether SHB 2167 discriminates against interstate commerce, Senator Liias admitted that the answer is "not clear" but that he did not see discrimination primarily because out-of-state banks operating in Washington that do not meet the income threshold would not pay the higher tax rate. *Id.*

No. 98760-2

is what's going to give us a chance to make sure that we're putting people first." H.

FLOOR DEB., *supra*, at 18 min., 11 sec., 1 hr., 8 min., 25 sec. (Representative Tarleton's

remarks on SHB 2167's final passage reiterated the goal of generating income and

righting the regressive tax code).

Furthermore, we reject the Association's assertion that the legislature departed

from normal procedure and so demonstrated discriminatory intent. Under *Waste*

*Management Holdings, Inc. v. Gilmore*, significant departures from normal procedures

are probative of discriminatory intent. 252 F.3d 316, 336 (4th Cir. 2001). No departure

occurred here. Indeed, SHB 2167 followed the standard legislative process:

Representative Tarleton introduced the bill in the House of Representatives where it was

referred to the finance committee; that committee held a public hearing, replaced the

original bill with a substitute bill, and voted to pass the bill. *See Bill Information: HB*

*2167*, WASH. ST. LEGISLATURE,

https://app.leg.wa.gov/billsummary?BillNumber=2167&Year=2019&Initiative=false

(last visited Sept. 20, 2021).[9] SHB 2167 then moved to the House floor for consideration

during which lawmakers thoroughly debated proposed amendments and the bill itself

before passing it. *Id*. SHB 2167 followed the same pathway in the Senate. *See id*. That

the bill was introduced, debated, and voted on quickly simply does not show a

---

[9] *See generally Overview of the Legislative Process*, WASH. ST. LEGISLATURE,
https://leg.wa.gov/legislature/Pages/Overview.aspx (last visited Sept. 20, 2021) (outlining the
lawmaking process in Washington State).

31

No. 98760-2

deprivation or a departure from the standard legislative process. *See Gilmore*, 252 F.3d at 336.[10]

Even if we concluded that SHB 2167's legislative history is ambiguous, such a determination does not overcome the express language of the legislation. The preamble of SHB 2167 demonstrates the tax's nondiscriminatory purpose to raise revenue and address disparities in wealth and income by imposing an additional tax on institutions generating immense profits. *See* LAWS OF 2019, ch. 420, § 1.

RCW 82.04.29004 is a progressive measure designed to tax financial institutions located in Washington and beyond state lines. Similar to the federal income tax and other graduated state tax structures, RCW 82.04.29004 applies a higher tax rate to those entities most able to pay it: prosperous corporations. *See Quarty v. United States*, 170 F.3d 961, 967 (9th Cir. 1999) (citing Joseph Bankman & Thomas Griffith, *Social Welfare and the Rate Structure: A New Look at Progressive Taxation*, 75 CAL. L. REV. 1905, 1906 (1987) (noting that progressivity has been part of federal income tax system since its inception)); Br. of Appellants App. (listing graduated corporate income taxes imposed in 14 states).

---

[10] The Association invites us to consider the "unconstitutional process" by which SHB 2167 was introduced, that is, it was offered as a title-only or blank bill in order to evade the requirement that bills be introduced at least 10 days before the end of the legislative session. Br. of Resp'ts at 39 (citing WASH. CONST. art. II, § 36). The trial court dismissed this constitutional claim pursuant to the enrolled bill doctrine, which rendered the claim nonjusticiable. *Id*. at 39 n.31; *see also* Reply Br. of Appellants at 22. This case is not the proper venue to collaterally attack or relitigate a dismissed issue. We are left, therefore, with only the Association's assertion that the bill's introduction significantly diverged from normal legislative procedure. However, the Association offers little argument and no case law or persuasive authorities in support. Even if we agree the action was a departure from normal operations, the Association does not show it was a *significant* one. We decline the invitation to consider this evidence in light of the scant argument from the Association and the State.

"'Taxes are what we pay for civilized society . . . [.]'  A[n apportioned] tax measured by the net income of residents is an equitable method of distributing the burdens of government among those who are privileged to enjoy its benefits." *New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313, 57 S. Ct. 466, 81 L. Ed. 666 (1937) (first alteration in original) (citation omitted) (quoting *Compañía Gen. de Tabacos v. Collector*, 275 U.S. 87, 100, 48 S. Ct. 100, 72 L. Ed. 177 (1927)).  Washington's tax code already distinguishes between profitable taxpayers, providing small businesses with tax credits. *See* SEIU Am. Br. at 19 (citing RCW 82.04.4451).

Indeed, it is important to understand what this case is not about.  The Association admits that its members must pay B&O taxes even though they are located out-of-state. *See* Br. of Resp'ts 4-10; RCW 82.04.290.  And, the Association does not appear to argue that a state *cannot* impose a graduated B&O tax on corporate income.  *See* Br. of Resp'ts at 32; *see also* FINAL B. REP. ON ENGROSSED SUBSTITUTE S.B. 6492 (increasing the B&O base rate from 1.5 percent to 1.75 percent for businesses earning $1 million annually). Rather, the Association contends this particular tax rate based on income necessarily singles them out by incorporating out-of-state profits.  As explained above, this argument is unpersuasive.

The Association understandably dislikes the higher tax rate it must now carry.  But displeasure with a tax does not implicate the commerce clause, nor does it relieve those engaged in interstate commerce from their just share of state tax burden.  *W. Live Stock*, 303 U.S. at 254.  "'Even interstate business must pay its way.'"  *Id*. (quoting *Postal Tel.-*

33

*Cable Co. v. City of Richmond*, 249 U.S. 252, 259, 39 S. Ct. 265, 63 L. Ed. 590 (1919)).

The challenged tax asks only this.

For the foregoing reasons, the Association does not meet its burden of establishing

discriminatory purpose. *Hughes*, 441 U.S. at 336. Accordingly, we reverse the trial

court's determination on this point.

### D. *Pike* Balancing Test

RCW 82.04.29004 does not directly burden interstate commerce in effect or

purpose. Thus, the commerce clause is not implicated and *Pike* is unnecessary.

In similar instances, at least one federal circuit court of appeals has held that *Pike*

"is not the default standard of review for any state or local law that affects interstate

commerce." *Park Pet Shop*, 872 F.3d at 502 (citing *Nat'l Paint*, 45 F.3d at 1131). *Pike*'s

balancing test is triggered "only" when the challenged law discriminates against interstate

commerce in practice. *Id*. The Seventh Circuit reviews state and local laws in three

familiar categories: disparate treatment (facial discrimination), disparate impact

(discriminatory in effect or purpose), and "'laws that affect commerce without any

reallocation among jurisdictions,'" in other words, laws "'that do not give local firms any

competitive advantage over those located elsewhere.'" *Id*. (quoting *Nat'l Paint*, 45 F.3d

at 1131). In that final category, "'the normal rational-basis standard is the governing

rule.'" *Id*. (quoting *Nat'l Paint*, 45 F.3d at 1131). "'Unless the law discriminates against

interstate commerce expressly or in practical effect, there is no reason to require special

justification.'" *Id*. (quoting *Nat'l Paint*, 45 F.3d at 1132). "To put the point in plainer

34

terms: 'No disparate treatment, no disparate impact, no problem under the dormant commerce clause.'" *Id.* (quoting *Nat'l Paint*, 45 F.3d at 1132).

Here, RCW 82.04.29004 does not discriminate facially or in practice against interstate commerce. Neither the commerce clause nor *Pike* is implicated. And, the provision easily survives rational basis review. The State's justifications for the increased tax are explicitly set out in RCW 82.04.29004's preamble: raising revenue, addressing wealth and income disparity, and reorienting Washington's regressive tax system. *See* LAWS OF 2019, ch. 420, § 1. These are legitimate government interests, and the Association offers no reason to question that the 1.2 percent tax will not serve them.

The parties here do not contest *Pike*'s applicability. The State contends the tax easily passes the balancing test. The Association notes that *Pike* applies to nondiscriminatory taxes and asks that—if we hold the tax is neutral—we remand the case to consider *Pike* in the trial court.

Additionally, this court's previous commerce clause cases appear to apply *Pike* as a matter of course. *See, e.g.*, *Heckel*, 143 Wn.2d at 832 (stating that if a statute is facially neutral, a reviewing court balances the local benefits against the interstate burdens); *Bostain v. Food Express, Inc.*, 159 Wn.2d 700, 718-19, 153 P.3d 846 (2007) (concluding that a law was not facially or effectively discriminatory and that local interest was not outweighed by any burden on interstate commerce under *Pike*).

While we do not believe the *Pike* test is necessary here because no party asks us to depart from our prior cases, we will address it.

No. 98760-2

Challengers must show the burdens imposed on interstate commerce clearly outweigh the local benefits arising from it. *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019), *cert. denied*, 140 S. Ct. 2762 (2020). The Association fails to carry this burden.

As discussed above, the stated purpose of the increased tax rate is to generate revenue for essential services and to address disparities in wealth and income as well as the state's regressive tax code. LAWS OF 2019, ch. 420, § 1. The Association argued before the trial court that the tax fails *Pike* for three reasons: (1) the legislature's finding on national wealth and income disparity is not a legitimate *local* interest and reorganizing the tax burden has "nothing whatever to do with" wealth disparity or personal wealth,[11] (2) the effect on interstate commerce is not incidental because it imposes higher costs on institutions that will influence investment and pricing decisions, and (3) the local benefits could have been achieved through a less restrictive alternative.

First, the legislature clarified that wealth disparity included Washington citizens when it recognized that "[a]s a percentage of household income, middle-income families in Washington pay two to four times the amount of taxes as compared to top earners in the state. Low-income Washington families pay six times more in taxes than the wealthiest residents." LAWS OF 2019, ch. 420, § 1. And, it may be that increasing taxes on financial institutions will ultimately be passed to the consumer and have little beneficial effect on personal wealth, but the *Pike* balancing test "does not invite courts to

---

[11] *See* LAWS OF 2019, ch. 420, § 1 (noting the "wealth disparity in *the country* between the wealthy few and the lowest income families" (emphasis added)).

36

second-guess legislatures by estimating the probable costs and benefits of the statute, nor is it within the competency of courts to do so." *Brown & Williamson Tobacco Corp. v. Pataki*, 320 F.3d 200, 209 (2d Cir. 2003). Rather, "the court must confine its analysis to the purposes the lawmakers had for maintaining the regulation," and "the only relevant evidence concerns whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes." *Kassel*, 450 U.S. at 680 (Brennan, J. concurring). The Association offers no persuasive evidence that lawmakers did not rationally believe a progressive tax would, in some measure, address income and wealth disparity.

Second, economic hardship alone is insufficient to invalidate a law because the commerce clause protects markets, "not taxpayers as such." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 300, 117 S. Ct. 811, 136 L. Ed. 2d 761 (1997); *Am. Network, Inc. v. Utils. & Transp. Comm'n*, 113 Wn.2d 59, 76, 776 P.2d 950 (1989). Third, the legislature could have used a less restrictive method of generating review by imposing the 1.2 percent tax on all financial institutions as the Association claims. But levying further taxes on entities less able to pay than those wealthy few is contrary to the legislature's goal of changing the state's regressive tax code.

Because the Association does not show that the burdens imposed on interstate commerce clearly outweigh the local benefits arising from it, the tax satisfies *Pike*'s balancing test. *Rosenblatt*, 940 F.3d at 452.

No. 98760-2

In sum, because RCW 82.04.29004 is not discriminatory, we follow the Seventh Circuit to conclude that further analysis under *Pike* is unnecessary and that the tax easily satisfies rational basis review. The challenged statute also satisfies the *Pike* balancing test. Accordingly, we reverse the trial court's conclusion that the tax is invalid under the dormant commerce clause and instead uphold the law. *Heckel*, 143 Wn.2d at 833.

II. Standing To Challenge the Tax

The State contends that the Association lacks standing under the UDJA to challenge RCW 82.04.29004. The trial court disagreed. We affirm.

Standing refers generally to a party's right to bring a legal claim. *Wash. State Hous. Fin. Comm'n v. Nat'l Homebuyers Fund, Inc.*, 193 Wn.2d 704, 711, 445 P.3d 533 (2019). The UDJA provides a means by which a party may bring a claim for declaratory relief. The act states that "[a] person . . . whose rights, status or other legal relations are affected by a statute . . . may have determined any question of construction or validity arising under the . . . statute . . . and obtain a declaration of rights, status or other legal relations thereunder." RCW 7.24.020. Standing is a legal question we review de novo. *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 711 (citing *City of Snoqualmie v. Constantine*, 187 Wn.2d 289, 296, 386 P.3d 279 (2016)).

The UDJA is a remedial statute and is to be "liberally construed and administered." RCW 7.24.120. Standing is not intended to be a "high bar" to overcome. *Wash. State Hous. Fin. Comm'n*, 193 Wn.2d at 712. This court has acknowledged that the UDJA's procedures are "peculiarly well suited to the judicial determination of

38

controversies concerning constitutional rights and . . . the *constitutionality of legislative action*." *Seattle Sch. Dist. No. 1 v. State*, 90 Wn.2d 476, 490, 585 P.2d 71 (1978) (emphasis added).

Standing is determined by a two part test: (1) whether the interest sought to be protected is "'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question'" and (2) whether the petitioners have asserted "'injury in fact.'" *Grant County Fire Prot. Dist. No. 5 v. City of Moses Lake*, 150 Wn.2d 791, 802, 83 P.3d 419 (2004) (internal quotation marks omitted) (quoting *Save a Valuable Env't v. City of Bothell*, 89 Wn.2d 862, 866, 576 P.2d 401 (1978)). "When we are faced with an issue of significant public interest, standing is analyzed in terms of the public interests presented, and we engage in a more liberal and less rigid analysis." *Rocha v. King County*, 195 Wn.2d 412, 420, 460 P.3d 624 (2020) (citing *Farris v. Munro*, 99 Wn.2d 326, 330, 662 P.2d 821 (1983)).

Additionally, an association has standing to bring suit on behalf of its members when (1) the members of the organization would otherwise have standing to sue in their own right, (2) the interests that the organization seeks to protect are germane to its purpose, and (3) neither claim asserted nor relief requested requires the participation of the individual members. *Int'l Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wn.2d 207, 213-14, 45 P.3d 186 (2002).

The State principally contests that Association members have standing to sue in their own right. We disagree.

No. 98760-2

When the legislature enacts a specific statutory procedure diverting the superior court's jurisdiction into an alternate procedure, that procedure must be used. *New Cingular Wireless PCS, LLC v. City of Clyde Hill*, 185 Wn.2d 594, 600, 374 P.3d 151 (2016). According to the State, when the legislature enacted RCW 82.32.180, it set out the exclusive process for challenging excise taxes. RCW 82.32.180 provides the procedure for taxpayers seeking a tax refund. *See also Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 52, 905 P.2d 338 (1995) (right to bring an excise tax refund suit must be exercised in the manner provided by statute). RCW 82.32.180 is silent as to the procedure for parties such as the financial institutions here who have paid a tax, seek no refund, and instead challenge the tax's constitutionality. RCW 82.32.180 does not require Association members to utilize its process to the exclusion of the UDJA.

Furthermore, in *Tyler Pipe Industry, Inc. v. Department of Revenue*, 96 Wn.2d 785, 787, 793, 638 P.2d 1213 (1982), taxpayers contested the constitutionality of a tax without first filing a refund action. In that case, the Department of Revenue denied the taxpayer's correction assessment petition and the taxpayer sought declaratory and injunctive relief. *Id*. at 787. *Tyler Pipe* noted that the statutory scheme at issue provided the legal remedy of a refund suit, RCW 82.32.150, .180, but nevertheless held that the legislature did not limit the court's equitable powers in constitutional cases even when "the legal remedy may . . . be adequate." *Id*. at 791.

The State has not shown that the Association's members lacked individual standing to sue and offers no argument on the remaining standing requirements. *See Int'l*

40

*Ass'n of Firefighters*, 146 Wn.2d at 213-14. Thus, the State fails to show that the trial court erred in allowing the Association's action to proceed under the UDJA.

## CONCLUSION

RCW 82.04.29004 does not discriminate against interstate commerce in effect or in purpose. Rather, it applies equally to all financial institutions meeting the $1 billion income threshold, irrespective of whether they are based inside or outside of Washington. RCW 82.04.29004(1); LAWS OF 2019, ch. 420, § 2. The 1.2 percent tax is apportioned such that affected institutions remit taxes only on income generated in this state. The legislature expressly indicated that its purpose in enacting the tax was to raise revenue for essential services and to address our regressive tax code, both legitimate state interests that satisfy rational basis review. *See* LAWS OF 2019, ch. 420, § 1. The Association does not meet its heavy burden to prove the tax unconstitutional. *Heckel*, 143 Wn.2d at 832. Because RCW 82.04.29004 is not discriminatory, the dormant commerce clause is not implicated. But, in any event, the statute satisfies the *Pike* balancing test.

As to standing, the State fails to show the Association lacked representational standing to seek declaratory relief under the UDJA. We therefore uphold the constitutionality of RCW 82.04.29004, affirm the trial court's conclusion on standing, and remand the case for further proceedings consistent with this opinion.

No. 98760-2

_____
Madsen, J.

WE CONCUR:

_____          _____
                                                      Gordon McCloud, J.

_____          _____
Johnson, J.                                           Yu, J.

_____          _____
Owens, J.                                             Montoya-Lewis, J.

_____          _____
                                                      Whitener, J.

42

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

*Washington Bankers Association et al. v. State of Washington et al.*
(Stephens, J., concurring)

No. 98760-2

STEPHENS, J. (concurring)—I join the majority's holding that RCW 82.04.29004 does not discriminate against interstate commerce in purpose or effect. To me, that conclusion should end our discussion. The majority's additional analysis of the balancing test under *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S. Ct. 844, 25 L. Ed. 2d 174 (1970) is unnecessary. I therefore do not join Section I.D of the majority opinion. On this limited basis, I concur in the judgment affirming the Court of Appeals and remanding for further proceedings.

_____
Stephens, J.

_____
González, C.J.